*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Nos. 22-CV-0274 & 22-CV-0301

FELICIA M. SONMEZ,
APPELLANT/CROSS-APPELLEE,

V.

WP COMPANY LLC, D/B/A THE WASHINGTON POST, MARTIN BARON, CAMERON BARR, TRACY GRANT, STEVEN GINSBERG, LORI MONTGOMERY, AND PETER WALLSTEN, APPELLEES/CROSS-APPELLANTS.

Appeals from the Superior Court
of the District of Columbia
(2021-CA-002497-B)

(Hon. Anthony C. Epstein, Trial Judge)

(Argued November 16, 2023                    Decided January 30, 2025)

*Madeline Meth*, Georgetown Law Appellate Courts Immersion Clinic, with whom *Brian Wolfman* and *Esthena L. Barlow*, Georgetown Law Appellate Courts Immersion Clinic, and *Molly Bernstein*, *Elliott O'Brien*, *Jewelle Vernon*, *Daphne Assimakopoulos*, *Monica Kofron*, and *Chase Woods*, student attorneys, were on the briefs, for appellant/cross-appellee.

*Yaakov M. Roth*, with whom *Jacqueline M. Holmes* and *Joseph P. Falvey* were on the briefs, for appellees/cross-appellants.

*Arthur B. Spitzer* and *Scott Michelman* filed a brief on behalf of the *American Civil Liberties Union of the District of Columbia* as *amicus curiae*.

*Matthew K. Handley* and *Jim Davy* filed a brief on behalf of the *L.L. Dunn Law Firm, PLLC*, and the *Maryland Coalition Against Sexual Assault* as *amici curiae*.

*Filippo A. Raso*, *Allison Holt Ryan*, and *Alejandra Caraballo* filed a brief on behalf of *Claire Goforth* as *amicus curiae*.

*Charles D. Tobin* and *Alia L. Smith* filed a brief on behalf of the *Boston Globe Media Partners, LLC*, *E.W. Scripps Co.*, *Los Angeles Times Communications LLC*, *The Maryland-Delaware-DC Press Association*, *The National Association of Broadcasters*, *The National Press Club*, *The National Press Club Journalism Institute*, *National Review Institute*, and *Yelp Inc.* as *amici curiae*.

Before BECKWITH and DEAHL, *Associate Judges*, and GLICKMAN,[*] *Senior Judge*.

Opinion for the court by *Senior Judge* GLICKMAN.

Dissenting opinion by *Associate Judge* DEAHL, at page 98.

GLICKMAN, *Senior Judge*: Felicia M. Sonmez, a national news reporter employed by The Washington Post, sued the Post and six of its editors in Superior Court for violations of the D.C. Human Rights Act and for the common law tort of negligent infliction of emotional distress. Her complaint asserted that the defendants unlawfully discriminated against her on the basis of both her status as a victim of a sexual offense and her gender by taking specific adverse employment actions against

---

[*] Associate Judge AliKhan was originally assigned to this case. Following her appointment to the U.S. District Court for the District of Columbia, effective December 12, 2023, Senior Judge Glickman was assigned to take her place on the panel.

her and by subjecting her to a hostile work environment; and that the defendants unlawfully retaliated against her after she protested their discriminatory actions.

The defendants moved to dismiss the complaint pursuant to Superior Court Civil Rule 12(b)(6) for failure to state a claim upon which relief can be granted. In addition, contending that Sonmez's claims against them arose from acts in furtherance of the right of advocacy on issues of public interest, the defendants filed a "special motion to dismiss" Sonmez's complaint under the District of Columbia Anti-Strategic Lawsuits Against Public Participation Act (the "Anti-SLAPP Act").[1]

The Superior Court denied the special motion to dismiss on the ground that Sonmez's claims did not arise from speech triggering the protections of the Anti-SLAPP Act. However, the court granted the Rule 12(b)(6) motion, as it concluded, *inter alia*, that the complaint failed to plausibly allege that the defendants' challenged actions were motivated by unlawful discrimination or that the defendants retaliated against her because she protested such discrimination. Sonmez has appealed the dismissal of her Human Rights Act claims; she has not appealed the dismissal of her common law cause of action. The defendants have cross-appealed the denial of their special motion to dismiss.

---

[1] D.C. Code §§ 16-5501 to -5505.

In this opinion, we conclude that Sonmez's claims do not arise from "acts in furtherance of the right of advocacy on issues of public interest" within the meaning of the Anti-SLAPP Act. We therefore affirm the denial of the special motion to dismiss her complaint. We also conclude that Sonmez's complaint does plausibly allege that the defendants discriminatorily took certain adverse employment actions against her in violation of the Human Rights Act; these actions included, in particular, the imposition of restrictions on Sonmez's reporting assignments and a negative performance evaluation that affected her compensation. However, we conclude that the complaint does not plausibly allege that the defendants subjected Sonmez to a hostile work environment or that they retaliated against her in violation of the Human Rights Act because she protested discriminatory treatment. We acknowledge the defense argument that the restrictions imposed on Sonmez's writing assignments were editorial decisions made to ensure reader confidence in the objectivity of the Post's reporting, and therefore were within the protection of the First Amendment. However, at this stage of the litigation, before discovery has commenced, we conclude it is premature to decide whether the Post's stated reasons are supported by evidence and whether the defendants are entitled to invoke the First Amendment to justify their decisions. We leave that issue open at this time.

Accordingly, we reverse the dismissal of the count in Sonmez's complaint charging the defendants with adverse action discrimination, while we affirm the dismissal of her hostile work environment and retaliation claims.

## I. The Facts Alleged in the Complaint

Sonmez's highly detailed complaint alleges the following facts in support of her Human Rights Act claims against The Washington Post and its editors.

### A. Sonmez's Background and Her Employment by The Washington Post

Before the Post hired Sonmez as a reporter, she worked as a journalist in Beijing, China, and was a member of the Foreign Correspondents Club of China ("FCCC"). The President of the FCCC was Jonathan Kaiman, a male journalist who was the Beijing Bureau Chief for the Los Angeles Times. Sonmez alleges that, on September 16, 2017, after the FCCC's annual summer party, Kaiman sexually assaulted her "while she was too intoxicated to consent." Three days later, Kaiman allegedly apologized to her for his behavior. Sonmez did not report the sexual assault to the police, and for some time she did not tell anyone about it. But the

assault affected Sonmez profoundly; in the following months she struggled with depression, anxiety, and trust issues.

In January 2018, another woman came forward and publicly accused Kaiman of having coerced her into having sex with him while they were both working in Beijing. In response to this accusation, both the FCCC Board and the L.A. Times commenced inquiries into Kaiman's conduct. Kaiman met with the FCCC Board on January 11, 2018. The Board voted to oust Kaiman and he resigned from the organization.

During that FCCC Board meeting, Kaiman denied being aware of any other allegations of misconduct against him and said nothing about Sonmez's allegations. After the meeting, Sonmez confronted Kaiman about this denial and nondisclosure of his assault against her. Kaiman then informed her that he had not revealed her allegations to the L.A. Times either, and had instead said only that he had a recent encounter with another woman who was "not happy."

After hearing this, and moved by the example of the other woman who had made a complaint, Sonmez "felt compelled" to speak out, and she reported her allegations of sexual assault against Kaiman to both the FCCC and the L.A. Times. On May 16, 2018, the L.A. Times announced that it had suspended Kaiman from his job pending the outcome of its investigation. A representative of the L.A. Times

contacted Sonmez and asked her to participate in its investigation. There was news coverage of Kaiman's resignation from the FCCC and his suspension by the L.A. Times.

Not long after the L.A. Times announcement, Sonmez interviewed for a position with The Washington Post as a politics reporter with the breaking news team. During her interview, the Post's senior politics editor, Peter Wallsten, asked her why she had decided to speak publicly about Kaiman's sexual assault of her. Sonmez explained that she wanted to counter her assailant's misrepresentations and to prevent him from harming other women.

The Post extended an offer of employment to Sonmez, which she accepted. In June 2018, after she started working there, Wallsten asked her why she did not go to the Beijing police after Kaiman assaulted her. Sonmez was "troubled" by the question's implication that her failure to file a report with the police raised doubt about the allegation, and by Wallsten's apparent lack of understanding regarding the consequences she could have faced as a female foreign journalist had she claimed to the Chinese police that another foreign journalist had sexually assaulted her.

## B.     The First Reporting "Ban"

During her first three months with the Post, Sonmez wrote more than 140 news stories, including at least seven stories concerning claims of sexual misconduct.  There were no complaints about her reporting.  During this period, on August 30, 2018, Sonmez learned that the L.A. Times had concluded its investigation and that Kaiman had resigned from the newspaper (though this had not yet been announced publicly).  Tracy Grant, the Post's managing editor in charge of staff development and standards, told Sonmez to expect to be attacked online and suggested that she speak with the Post's public communications team if she wanted to prepare a public statement regarding the L.A. Times investigation.  Sonmez drafted a statement and submitted it to Grant, Wallsten, and the communications team for their suggestions and approval.  Grant assured Sonmez that the Post had "no desire" to prohibit her from issuing the statement.

In the meantime, the Post was covering the Senate confirmation proceedings regarding the nomination of then Judge (now Justice) Brett Kavanaugh to the Supreme Court. On September 16, 2018, the Post broke the news of Christine Blasey Ford's sexual assault accusation against Judge Kavanaugh.  Sonmez was assigned to report on the story along with two of her colleagues and to "anchor" the next day's coverage.  Although Sonmez "found it difficult to read about Ford's accusations

given her own history of assault," she went for a walk around the block "to collect herself" and then returned to work on the assignment. The article that Sonmez co-wrote appeared on the front page of the Post the next day. Sonmez received positive feedback from the Post's Congress Editor for her work on the story.

After the story was filed, Sonmez met with her editors to discuss her public statement about the L.A. Times investigation and Kaiman's resignation, which she now proposed to issue. By this time, Grant and the Post's lawyers had "signed off" on the statement. Wallsten suggested some additional edits, and Sonmez revised her statement in light of his feedback. Neither Wallsten nor Grant suggested that Sonmez could face any job-related repercussions as a result of putting out the statement.

During their meeting, Wallsten asked Sonmez how she was doing in light of Ford's sexual assault accusations. Sonmez said it had been difficult to read about the accusations and that she had taken a walk around the block to regain her composure, but that she then had returned to her office and resumed writing up the news story "as usual."

After her meeting with Wallsten, and with the Post's apparent blessing, Sonmez sent her revised statement about Kaiman and the L.A. Times investigation to the L.A. Times and news outlets that had covered the allegations against Kaiman.

In the statement, Sonmez thanked the L.A. Times for "taking [her] allegation seriously" and investigating Kaiman's behavior. However, stating that the "response of institutions" to women's complaints is an "essential part" of "combatting sexual misconduct," Sonmez faulted the L.A. Times for not being "transparent about the results of its investigation" and for not making "clear" whether Kaiman was fired or had resigned voluntarily. "Above all," Sonmez declared, "I stand in solidarity with [the woman] who took the brave step of speaking out first, paving the way for others to follow."

After Sonmez notified her editors that she had sent out this statement, Wallsten called her to a meeting the following morning with the Post's national editor, Steven Ginsberg, and its deputy national editor, Lori Montgomery. Sonmez had been scheduled to appear on MSNBC that afternoon to discuss the latest news in the Kavanaugh confirmation story, but Wallsten directed her to cancel her appearance.

At the meeting, the editors informed Sonmez that she was barred from writing on the Kavanaugh story until further notice. (Sonmez refers to this restriction as the "first ban" imposed on her by the Post.) In explanation, the editors linked the "ban" to what Sonmez had told Wallsten the previous day about her initial reaction upon learning of the accusations against Judge Kavanaugh, which Ginsberg said were "too

similar" to Sonmez's allegations against Kaiman. The editors also expressed dissatisfaction with Sonmez's statement regarding the L.A. Times investigation. Later, Ginsberg would claim the ban was ordered by the Post's executive editor, Martin Baron, who did not interact with Sonmez directly during these events.

In a follow-up conversation that afternoon, Montgomery asked Sonmez why she did not go to the police in Beijing to report Kaiman's sexual assault. Montgomery told Sonmez she was taught that a woman should "just say no" if a man tries to assault her.

Sonmez perceived from the editors' explanation and remarks that she was being banned from covering one of the biggest stories of the year, despite her capability and the undisputed quality of her work, because of her status as a victim of a similar sexual offense. That afternoon she sent Ginsberg, Montgomery, Wallsten, and Grant an email protesting the decision to "sideline[] [her] from this story based on what happened to [her] in Beijing." Because the editors had brought up what she told Wallsten about her initial reaction on learning of Ford's accusation, Sonmez stressed that she "felt comfortable and well-equipped to report on" the allegations objectively. "I never said that I was concerned about my ability to cover the story fairly, or that I was struggling to be fair," she wrote. "[W]hile it was difficult to read the story, as it would be for any survivor of sexual assault, I prioritize

my responsibility as a journalist to be fair and impartial and 'just do the work.'" Sonmez emphasized that she had "made no statements about the merits of the Kavanaugh case," and that she had issued her public statement regarding the L.A. Times investigation of Kaiman with her editors' prior approval. Sonmez also included links to recent news stories she had written that were related to the issue of sexual misconduct and that evidenced the quality of her reporting on such matters.

That evening, Sonmez met with Ginsberg, Grant, and Cameron Barr, a managing editor of the Post. They told her the ban would remain in place. Barr accused Sonmez of being an "activist" who had "taken a side on the issue" of sexual assault and was "trying to have it both ways" by publicly disclosing her own victimization, criticizing news organizations like the L.A. Times, and continuing to report on the topic. Ginsberg raised his voice and said it would present "the appearance of a conflict of interest" if Sonmez continued reporting on the Kavanaugh nomination or any other issues related to sexual misconduct. Barr elaborated, saying "We don't have reporters who make statements on issues they are covering. We don't want the external perception that we have an advocate covering something she has experienced. The work you do intersects with what you experienced in your life." Grant added that the editors had to "protect the story," allegedly insinuating that Sonmez was "a threat to the Post's ability to win prizes" for its coverage of Ford's accusations.

Sonmez drafted an email to the numerous reporters and editors with whom she regularly worked to inform them of the writing restriction she was under and the explanation she was given that the ban was imposed to avoid the appearance of a conflict of interest. She sent the draft email to Ginsberg, Wallsten, and Montgomery for their review. Ginsberg instructed her not to send it, and she did not do so. The complaint alleges that "Sonmez was thereby forced to repeatedly explain, on the numerous occasions when a story related to sexual assault presented itself, that she was banned from covering such stories because she is a survivor of sexual assault and has spoken out about her own experience."

The next day, September 19, 2018, Sonmez received an email inquiry from a reporter with the South China Morning Post who was writing a story about Kaiman. The reporter told Sonmez that Kaiman claimed Sonmez had a crush on him, that his sexual encounter with her in Beijing had been consensual, and that if it had truly been non-consensual, Sonmez would have gone to the Chinese police. The reporter sought Sonmez's response. Sonmez found Kaiman's assertions sickening. She forwarded the email to her editors. Grant and Ginsberg told her the Post would not advise her how to respond, but Wallsten informed Sonmez that he was "copying others here who should also be up to speed on this and involved in the deliberations regarding your response, as there are clear implications for the Post." Grant and Ginsberg then instructed Sonmez to take a few days off from work.

While she was on leave, Sonmez asked for clarification of the Post's role in connection with her response to Kaiman's allegations against her. Grant replied that the Post wanted to receive updates but that Sonmez would have to decide on her own how she would respond. Sonmez's leave of absence then was extended indefinitely, adding to her distress and causing her to fear that her job was in jeopardy. In a phone call on the evening of September 26, 2018, Grant chastised Sonmez for not having included Kaiman's assertions that their sexual encounter was consensual when she initially reported her charges against him (which Sonmez did, of course, long before she learned of Kaiman's assertions from the South China Morning Post reporter). Grant lectured Sonmez that "the only thing we have as journalists is our credibility and our willingness to be transparent." Sonmez responded that she was semi-conscious during Kaiman's assault and vehemently denied his characterization of their encounter as consensual.

Sonmez was allowed to return to work on September 30, 2018, after Judge Kavanaugh and Ford had finished testifying before the Senate Judiciary Committee. In a meeting with Ginsberg, Wallsten, and Grant on October 2, Grant again brought up Kaiman's claims that their sexual encounter was consensual and expressed anger at Sonmez's attempt to explain to her colleagues in an email that she had been barred from covering the Kavanaugh story to avoid any appearance of a conflict of interest. Grant also said she wanted this to be the last discussion they had on the issue of

Sonmez's assault. The next day, Grant emailed Sonmez. "Just to reiterate what we discussed yesterday," Grant wrote, "we feel it's best for the public discussion of this to be in the rear-view mirror. If you feel the need to respond/discuss further publicly . . . doing so would potentially limit the stories you could handle."

There is no indication that Sonmez disobeyed this injunction. Nonetheless, on October 10, 2018, Ginsberg and Wallsten informed Sonmez that she was prohibited from participating in *any* #MeToo-related coverage until the mid-term elections were over. This expanded prohibition prevented Sonmez from working on a number of stories, some of which were barely (if at all) related to sexual misconduct.[2] The ban continued until it expired by its terms on the day of the mid-term elections, November 7, 2018. After that date, Sonmez wrote approximately two dozen stories relating to sexual misconduct or #MeToo.

Sonmez alleges that the extended prohibition in 2018 on her coverage of such news stories was retaliatory, discriminatory, and "consistent with the unequal treatment women experience at the Post in comparison to men." According to the

---

[2] For example, the complaint alleges, Sonmez was not allowed to write about a United States Senator's reelection campaign because the story involved a campaign ad in which the Senator inappropriately identified survivors of sexual abuse; or about a lieutenant governor's resignation because the story involved inappropriate comments the lieutenant governor had made to a woman.

complaint, the "vast majority of the Post's department heads" historically have been men, some of whom "manage their female subordinates based on outdated stereotypes, including that women are unable to be as 'objective' as their male colleagues because, *inter alia*, they are too emotional."  As an example of this in her own experience, Sonmez alleges that when she was tasked with writing about a rally at which then former President Trump unexpectedly "[made] derogatory statements about Mr. Kavanaugh's accuser[,]" Wallsten cautioned her to "write it straight," implying that she was "incapable of unbiased reporting."  This was "eerily similar," the complaint goes on to allege, to Martin Baron's publicly reported response to a suggestion that a female editor be added to an all-male team covering allegations of sexual harassment against a prominent network television executive.  The complaint quotes a *New York Magazine* story on the episode (entitled "What Was the Washington Post Afraid of?") as stating that "Baron agreed [to the suggestion] but added that all decisions about the story would be made strictly on the 'basis of journalism,' which suggested that Baron believed that women were incapable of editing a story involving sexual misconduct in an objective and unemotional manner."

**C.     Resumption of the Reporting "Ban" and Warning for Violation of the Post's Social Media Policy**

Less than a year after the restriction on Sonmez's reporting was lifted, the editors decided to reimpose it.  According to Sonmez's complaint, this came about as follows.

In August 2019, *Reason Magazine* published an article about Kaiman and the sexual assault allegations that had been made against him.  The article was highly critical of Sonmez and the other woman who had complained about Kaiman.  It described the "injustice" Kaiman had suffered from the effect of their accusations on his life and career trajectory.  The complaint states that after this article appeared, "dozens" of abusive and threatening messages targeting Sonmez were posted online.  The messages included comments calling her "evil," urging her to kill herself, and stating that if any women deserved to be raped, she and Kaiman's other accuser did.

Sonmez informed her editors of the article and the personal attacks she was receiving.  On August 25, 2019, Sonmez submitted a request for correction of the article to *Reason Magazine*.  She posted this request on her Twitter account, which identified her as a Post reporter, and thereafter "pinned" the post at the top of her Twitter profile.  On August 30, the website *Jezebel* posted its own article pointing out what it claimed were errors and omissions in the *Reason Magazine* piece.

Two days later, on September 1, NPR's "All Things Considered" program posted a radio segment in which the host and guests discussed the *Reason Magazine* article and the #MeToo movement. During the broadcast, Kaiman's actions were defended as "private encounters between two consenting adults," and one of the guests, herself a prominent magazine journalist, mischaracterized Sonmez's allegations and impugned her motives for speaking out against Kaiman. After the broadcast, on September 3, 2019, this guest engaged in a Twitter exchange with Sonmez directly and criticized her for ruining Kaiman's life. This exchange prompted another wave of online abuse of Sonmez by "dozens" of Twitter users.

Up to this point, none of Sonmez's editors had raised any objections to her Twitter posts. But the following day, September 4, 2019, Ginsberg and Montgomery informed Sonmez that the Post was again suspending her indefinitely from covering any #MeToo-related stories. Sonmez refers to this as the "second ban." As in the case of the first ban, the complaint alleges that Ginsberg reportedly claimed it was Baron who made the decision to impose the second ban. Sonmez "vehemently protested the ban for essentially the same reasons" she had protested the earlier ban, but to no avail. Once again, Sonmez was forced to explain repeatedly to her assignment editors and colleagues that she was prohibited from covering #MeToo-related stories because she was a victim of a sexual offense and had spoken out.

A month later, on October 2, 2019, Ginsberg instructed Sonmez to clear all future posts about her assault with her editors. The following day Ginsberg asked her to remove her pinned tweet correcting the *Reason Magazine* article because, he said, the tweet made him "uncomfortable." Ginsberg did not suggest that the tweet violated any Post policy or guideline. Sonmez resisted removing the tweet, explaining that she kept it up to protect herself from the false statements being made about her and to prevent further online attacks. Ginsberg persisted in urging Sonmez to take down the tweet, telling her that if she removed it, the Post could allow her to tweet responses to any future attacks. Sonmez explained that she was maintaining the pinned tweet to *prevent* such attacks. But Ginsberg continued to press Sonmez to remove it. Sonmez asked him whether he would put the request in writing. Ginsberg, who then ended the conversation, never did so.

However, two weeks later, on October 17, 2019, Grant and Barr called Sonmez to a meeting and issued her a written warning stating that she had violated the Post's Social Media Policy by defending herself with her pinned tweet calling for correction of the *Reason Magazine* article. The warning stated that "reporters should make every effort to remain in the audience, to be the stagehand rather than the star, to report the news, not to make the news." The warning further stated that future infractions of the Social Media Policy would lead to Sonmez's termination. During the meeting, Grant belittled Sonmez's concerns about the coverage of her

allegations against Kaiman as involving "errors real or imagined." Grant also told Sonmez to stop taking notes during the meeting because "our words could be used against us."

This was the first time that Sonmez's editors claimed she had violated the Social Media Policy (or any policy of the Post). Sonmez asked how she should proceed, consistent with that policy, if she received further online attacks. The editors did not give her any guidance.

On November 25, 2019, Sonmez and representatives of the Washington Post Guild met with Grant and the Post's attorney to discuss a grievance the Guild had filed concerning Sonmez's purported violation of the Social Media Policy. At the meeting, Sonmez and the Guild requested written guidance on how Sonmez could defend herself online without violating the policy, because the policy did not specifically address the issue and Sonmez's editors had made conflicting statements on whether this was a personal or professional matter, whether Sonmez needed approval to tweet, and whether the Post wanted or had the authority to control her tweeted responses. Grant ended the meeting shortly after these questions were raised, without answering them. The second ban remained in effect.

### D.     The Second Alleged Violation of the Social Media Policy

Two months later, on January 26, 2020, Sonmez was at her desk in the newsroom when news broke of basketball star Kobe Bryant's death in a helicopter crash. Sonmez posted on her Twitter feed a link, without any commentary, to a *Daily Beast* article about allegations of sexual assault that were lodged against Bryant in 2016.[3] Sonmez's Twitter account and her work email were then "inundated" with abusive messages, including threats of rape and murder. Sonmez responded on Twitter that the barrage of threats "speaks volumes about the pressure people come under to stay silent in these cases."

Later that same afternoon, Baron sent Sonmez an email containing a screenshot of her tweet with the link to the *Daily Beast* article, with the comment, "Felicia. A real lack of judgment to tweet this. Please stop. You're hurting this institution by doing this." Baron sent copies of his email to Grant, Ginsberg, and Barr.

Meanwhile, Sonmez emailed Grant and Wallsten to inform them that she was receiving threats by Twitter and email. Grant told her to delete her initial tweet and

---

[3] The complaint alleges that "[p]osting articles from other news organizations is a typical social media practice for journalists at the Post and in virtually all other news organizations throughout the world."

her responses and to refrain from "further discussion on social media of a story that does not pertain to your coverage area." Sonmez replied that she would delete the tweets and asked what to do about the threats she was receiving, one of which disclosed her home address (an act of "doxxing"). Grant responded that the Post's "Director of Social and Operations" could reach out to Twitter to get the doxxing "taken care of" but said nothing else about ensuring Sonmez's safety. Sonmez sent another email to Grant in which she reiterated her need for "some further guidance from the Post's security team on what to do," since she was "receiving a flood of threats" and "[p]eople are now emailing me with my home address and telling me I deserve to be raped/killed/etc." In reply, Grant again instructed Sonmez to delete her tweets (which Grant said she was "still seeing"), told Sonmez she was "not helping her situation" and "in violation of a directive from a managing editor" by keeping her tweets up, and said that "[t]he security protocol is not to respond to threats." Sonmez confirmed that she had deleted her tweets. Grant then thanked her for doing so, suggested that Sonmez might "consider a hotel or a friend's place for this evening," and said that she would be back in touch with Sonmez later.

It was apparent to Sonmez that Grant viewed the deletion of her tweets as more urgent than the death and rape threats and doxxing that Sonmez was enduring. The complaint alleges that "[i]nstead of contacting the Post's security team, as is the protocol when a reporter is threatened," Grant simply advised Sonmez to ignore the

threats.  However, Sonmez then reached out to the Director of Security herself and copied him on her emails, and he offered her assistance.  Fearing to go home, Sonmez checked into a hotel.

Later that night, Grant called Sonmez again to inform her that she had been placed on administrative leave (with pay) while the Post investigated whether her tweets relating to Kobe Bryant had violated the Post's Social Media Policy and warranted disciplinary action.  The Post announced this in a public statement that was disseminated in stories appearing in the media and online.  Grant was quoted in one story as stating that Sonmez's "tweets displayed poor judgment that undermined the work of her colleagues."  Sonmez's complaint alleges that "Sonmez, who was living at a hotel and dealing with rape and murder threats, experienced severe emotional distress and embarrassment" as a result of Grant's public admonishment and the Post's actions, "all of which were taken because of her status as a victim of a sexual offense."

The Washington Post Guild quickly came to Sonmez's defense in a letter to Baron and Grant that was signed by over 300 Post employees and was shared with the public via a link on Twitter.  The letter stated the following:

> We write to share our alarm and dismay that our newsroom leaders have chosen to place Felicia Sonmez on leave over a social media post, and to urge The Post to take

immediate steps to ensure the safety of our colleague. This is not the first time that The Post has sought to control how Felicia speaks on matters of sexual violence. Felicia herself is a survivor of assault who bravely came forward with her story two years ago. When articles attacking her were published in other outlets, The Post did not release a statement in support of one of its respected political reporters. Instead, management issued a warning letter against Felicia for violating The Post's vague and inconsistently enforced social media guidelines.

The following day, after Guild stewards and Sonmez met with Grant and Barr to discuss the matter, Grant informed Sonmez that she had not violated the Post's Social Media Policy and that her suspension was lifted.  That evening, Grant issued a newsroom-wide memo, signed by Baron and Barr, which acknowledged that the Post's Social Media Policy needed to be updated because "individual cases that have arisen in recent years indicate to us that further guidance is needed."  The memo also assured the Post's staff that "[w]e always endeavor to act quickly and thoroughly to protect and defend our colleagues from intimidation and threats."

The next month, the Post began to reevaluate its Social Media Policy and Baron, Grant, and other editors held "social media conversations" with newsroom employees to elicit their views.  At one such meeting on February 20, 2020, an employee asked Baron whether matters such as murder and sexual assault can be viewed as issues with "two sides."  According to the complaint, Baron responded:

"Murder is evil, okay? . . . It's when you get to the point of advocacy of certain policies [that the line is crossed]."

**E.    Sonmez's 2019 Performance Evaluation and the Continuation of the Second Ban**

In April 2020, Sonmez received a lower rating in her 2019 Performance Evaluation, which resulted in a lower raise than she would have received otherwise. The complaint alleges that, in a meeting the following month to discuss her evaluation, Wallsten and Montgomery told Sonmez that the "basis" for her lower rating was her "tweets defending herself from false claims related to her sexual assault." Sonmez again asked for clarity as to the prohibition on her writing about sexual assault. Montgomery responded that there was "concern about an appearance of a conflict on these issues."

Meanwhile, the second ban was still in effect, and it prevented Sonmez from covering a number of stories involving prominent individuals. In May 2020, after Ginsberg confirmed that the ban would preclude Sonmez from covering allegations then being made against Joe Biden, Sonmez protested, asserting in an email that it was "simply discriminatory for the Post to bar one of its reporters from covering sexual assault due to her identity as a sexual assault survivor who has publicly come forward," and that the ban was "humiliating" her before her editors and diminishing

her in comparison with her colleagues whose coverage areas were not so restricted. Sonmez received no response to her protest.

Sonmez alleges the Post strongly supported other reporters (who were not sexual assault victims) when they spoke out as she did, or were harassed as she was, and did not curtail their reporting activity. As one example, her complaint cites the Post's backing of her colleague Michelle Ye Hee Lee, who was, like Sonmez, a reporter on the Post's National desk. Lee was the president of the Asian American Journalists Association. According to Sonmez's complaint, Lee reported on anti-Asian hate crimes for the Post, and also frequently issued statements via social media condemning such crimes and discussing the shortcomings in other news organizations' coverage of anti-Asian violence. Lee even appeared in person on a CNN program to address that issue. But rather than criticize or rein in Lee's activities (as it had criticized and restricted Sonmez with respect to allegedly comparable activity pertaining to sexual assault stories), the Post gave her a prominent platform for carrying on her advocacy and publicly praised her work; Wallsten, for example, tweeted that Lee was "a stellar journalist," her leadership was "an inspiration," and he was "proud to call [her] a colleague."

The complaint also cites the Post's support for another colleague, Seung Min Kim, when she was subjected, as Sonmez had been, to a barrage of threatening

messages sent to her inbox and Twitter feed. (This harassment of Kim allegedly was sparked by an online photo of her confronting Senator Lisa Murkowski about criticism the Senator had received.) In response to the harassment of Kim, her editors Ginsberg, Wallsten, and Montgomery reached out to support her and publicly defended her on Twitter and other platforms. Ginsberg, for example, tweeted that "[n]o one should have to endure the racist, sexist, ill-informed comments that have flooded her inbox." During a March 2021 Town Hall meeting on "race, trust and newsroom culture" held by senior editors Barr and Ginsberg with the newsroom staff, Ginsberg reiterated the Post's support of Kim and emphasized the importance of defending reporters from harassment and giving them agency in handling it. However, when a staffer asked about the editors' failure to support and defend Sonmez when she was similarly subjected to online harassment and threats, they refused to discuss the difference in treatment. Barr dismissed the question saying this was not the time to compare cases, but no editor claimed Sonmez's situation was materially distinguishable from Kim's. After this event, Sonmez took several days off, "as she was experiencing symptoms associated with post-traumatic distress."

The second ban on Sonmez's reporting of sexual assault-related news stories remained in effect for a year and a half. Then, on Sunday March 28, 2021, *Politico* published a story about the ban. Sonmez posted a link to the story on Twitter and

tweeted, "I'm not planning on going anywhere. The Washington Post needs to do better. I just want to do my job." Sonmez added, "I've tried to keep my head down and just do my job the best I can, despite having to take myself off sexual assault-related stories at least once every week or two, sometimes even more often." She also wrote the following:

> I faced no ban my first three months on the job. I wrote #MeToo-related stories with no problem. It was only once the Kavanaugh story broke in Sept. 2018 that the editors enacted one. It was lifted several months later, then reinstated in late 2019 when I was being attacked online after the publication of a story about the man who assaulted me. The ban has been in place ever since for more than a year now . . . . If I am attacked online by an army of misogynist trolls, that does not harm The Washington Post any more than my awesome colleague [Ms. Kim] harms the Post by facing a relentless swell of racism online. Neither of us is less capable of doing our job due to our identity.

On the following day, March 29, 2021, the Post lifted the second ban, effective immediately, and allowed Sonmez to resume covering #MeToo-related news stories.

Sonmez alleges that due to the bans on her reporting and the other discriminatory conduct she endured, she suffered not only economic loss and deprivation of professional opportunities, but also constant humiliation and embarrassment, and considerable mental and emotional distress. "At various times," Sonmez alleges, she "became severely depressed, developed intense anxiety and

received treatment from therapists and psychiatrists who she continues to see," and she was prescribed anti-depressant medications. She "also experienced physical pain, including severe pain in her jaw from grinding her teeth at night" and developed temporomandibular joint disorder requiring her to undergo two oral surgery procedures to relieve the pain. When the Post lifted the second ban, the Post's Guild issued a statement that took note of its harsh impact on Sonmez. "We're glad to see The Post reverse its harmful stance and allow our colleague Felicia Sonmez to do her job," the Guild said. "But this decision," it added, "came only after much public criticism and at the expense of Felicia's mental health. The Post must do better."

## II. Procedural History

On July 21, 2021, Sonmez filed her complaint in Superior Court against the Post and six of its editors (whom we shall refer to collectively as "the Post"). The complaint asserted that the Post had (1) discriminated against her based on her status as a victim of a sexual offense and/or her sex (primarily by imposing the two "bans," giving her an adverse performance evaluation, and suspending her pending a determination of whether she had violated the Post's Social Media Policy); (2) subjected her to a hostile work environment, and (3) retaliated against her for her protected activity in opposing the discriminatory treatment, all in violation of the

District of Columbia Human Rights Act. The complaint also asserted a claim of negligent infliction of emotional distress under D.C. common law.

The Post filed a special motion to dismiss the complaint under the District of Columbia Anti-SLAPP Act, in which it contended that Sonmez's claims against the "bans" arose from expressive conduct protected by that Act. When a defendant makes such a prima facie showing under the Act, the burden shifts to the plaintiff to proffer evidence showing a likelihood of success on the merits of her claims. The Superior Court concluded, however, that the Anti-SLAPP Act did not apply to the bans because a decision not to assign Sonmez to write certain stories was not an "act in furtherance of the right of advocacy on issues of public interest" within the meaning of the Act. Principally for that reason, the court denied the special motion to dismiss even though Sonmez did not proffer any admissible evidence to show a likelihood of success on the merits of her claims.

The Post also moved to dismiss Sonmez's complaint pursuant to Civil Rule 12(b)(6), for failure on its face to state a claim upon which relief could be granted. The court granted this motion. It held, first, that Sonmez's Human Rights Act claims based on the first ban (which lasted from September to early November 2018) were time-barred by the one-year statute of limitations for actions under that

Act.[4]  Sonmez does not dispute that her first-ban claims are time-barred and that evidence relating to the first ban is admissible only as background evidence (but with a qualification relating to her hostile work environment claim that we discuss hereinbelow).

Second, the court held that Sonmez's allegations of discriminatory treatment and subjection to a hostile work environment failed to state a claim for relief because the complaint did not plausibly allege that the Post took action against her for unlawful discriminatory reasons, i.e., because of Sonmez's status as a victim of sexual assault or a woman.  The court found that the factual allegations in the complaint made it clear that "[t]he Post attributed all of the employment actions about which Ms. Sonmez complains to her public statements, not to her victim status or sex," and that this "stated reason—avoiding the appearance or a perception of bias by its reporters—is a basis . . . that does not implicate the DCHRA."

---

[4] In pertinent part, D.C. Code § 2-1403.16(a) states that "[a] private cause of action pursuant to this chapter shall be filed in a court of competent jurisdiction within one year of the unlawful discriminatory act," subject to exceptions not applicable here. The court ruled that Sonmez's claims relating to the second ban, which began on September 4, 2019 (more than a year before she filed her complaint), were not similarly time-barred because the statute of limitations was tolled due to the COVID-19 public health emergency for a period from March 18, 2020 through March 30, 2021.  This ruling also applies to Sonmez's Human Rights Act claims based on other actions taken during the period of the second ban, such as the April 2020 negative performance rating.  The Post does not challenge this ruling.

Third, the court held that Sonmez's allegations of unlawful retaliation did not state a claim for relief because her complaint did not plausibly allege that her objections to the bans qualified as protected opposition to violations of the Human Rights Act or that her objections were causally linked to any adverse retaliatory acts by the Post.

Because the court granted the Rule 12(b)(6) motion on those grounds, it stated that it did not need to decide whether (1) the alleged bans and other challenged actions constituted adverse employment actions sufficient to support a Human Rights Act complaint; or (2) the alleged hostile aspects of her work environment were severe and pervasive enough to affect a term or condition of her employment.

Lastly, the court ruled that the complaint did not state a plausible claim of negligent infliction of emotional distress, in essence because the relationship between a newspaper and its reporters is not a special relationship that necessarily implicates the reporter's emotional well-being or makes it especially likely that the newspaper's negligence would cause serious emotional distress to its reporters. Sonmez does not appeal the dismissal of this claim.

Sonmez timely appealed the grant of the Post's 12(b)(6) motion to dismiss. The Post cross-appealed the denial of its Anti-SLAPP Act special motion to dismiss.

## III. The Anti-SLAPP Act Special Motion to Dismiss

We consider first the trial court's denial of the special motion to dismiss. The court concluded that the motion failed as a matter of law to make the prima facie showing, required by the Anti-SLAPP Act,[5] that Sonmez's claims arose from an "act in furtherance of the right of advocacy on issues of public interest" as that term is defined in D.C. Code § 16-5501(1). Our review is de novo.[6] For the following reasons, we affirm that denial.

Anti-SLAPP Acts in this and other jurisdictions have been enacted to combat so-called "strategic lawsuits against public participation" (SLAPPs), which are commonly described as legally meritless "action[s] filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view."[7] Although the various state anti-SLAPP laws share that common goal, they differ from our own law (and from each other), sometimes only terminologically and sometimes very significantly in their scope and other ways. For that reason, and because the District of Columbia Anti-SLAPP Act was not modeled on any particular state's law, we have said that we "decline" to "follow the

---

[5] *See* D.C. Code. § 16-5502(b).

[6] *See Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1240 (D.C. 2016).

[7] *Id.* at 1226 (quotation marks omitted).

precedent of other states" in this area in construing our Act.[8]  Instead, we adhere to "basic principles of statutory interpretation" followed in this jurisdiction and "look to the plain language of the statute" to construe the D.C. Anti-SLAPP Act.[9]

The special motion to dismiss is a statutory procedure adopted in our Act to enable a SLAPP defendant to expeditiously and inexpensively defend against such a meritless "suit that is filed, not to succeed, but to prevent or punish the defendant's speech or advocacy."[10]  It may appear difficult to see how that description could apply to Sonmez's lawsuit, but the question before us is whether her complaint is subject to the specific terms of the Anti-SLAPP Act and its special motion to dismiss procedure, which does not condition granting a special motion to dismiss on a

---

[8] *Saudi Am. Pub. Rels. Affs. Comm. v. Inst. for Gulf Affs.*, 242 A.3d 602, 611 (D.C. 2020). The bill that became the District of Columbia's Anti-SLAPP Act was modeled on a bill then pending in Congress (which was not enacted). *See* Council of the District of Columbia, Committee on Public Safety and the Judiciary, Report on Bill 18-893, "Anti-SLAPP Act of 2010" (Nov. 18, 2010) ("2010 Committee Report"), at 4. (The 2010 Committee Report is available at https://lims.dccouncil.gov/downloads/LIMS/23048/Committee_Report/B18-0893-CommitteeReport1.pdf; https://perma.cc/NPS7-JG59 .)

[9] *Saudi Am. Pub. Rels. Affs. Comm.*, 242 A.3d at 611 (citing *District of Columbia v. Place*, 892 A.2d 1108, 1111 (D.C. 2006)).

[10] *Mann*, 150 A.3d at 1235 (internal citations and quotation marks omitted).

finding of an improper motive for the complaint.[11]   Even so, in construing the statutory procedure, we should do so in recognition of, and with an eye to effectuating, its limited intended purpose.

A party filing a special motion to dismiss must "make[] a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest."[12]   The Anti-SLAPP Act defines an "act in furtherance of the right of advocacy on issues of public interest" to mean:

> (A) Any written or oral statement made:
>
> (i) In connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; or

---

[11] *See Am. Stud. Ass'n v. Bronner*, 259 A.3d 728, 748 (D.C. 2021) (explaining that the Anti-SLAPP Act "does not call for inquiry into the plaintiff's motives; it focuses on the claim, not the claimant").

[12] D.C. Code § 16-5502(b). A "prima facie" showing is a showing sufficient to establish the matter in question unless it is rebutted by the non-movant. *See Bronner*, 259 A.3d at 744 n.57. If the requisite prima facie showing is made, § 16-5502(b) directs that "the motion shall be granted unless the responding party demonstrates that the claim is likely to succeed on the merits, in which case the motion shall be denied." Subsection (d) provides that "[i]f the special motion to dismiss is granted, dismissal shall be with prejudice." Despite its name, the special motion to dismiss is different from a Civil Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief can be granted. We have described the Anti-SLAPP Act special motion to dismiss as "essentially an expedited summary judgment motion," except that it "imposes the burden on plaintiffs and requires the court to consider the legal sufficiency of the evidence presented before discovery is completed." *Id.* at 741 & n.38 (quoting *Mann*, 150 A.3d at 1238 n.32).

(ii) In a place open to the public or a public forum in connection with an issue of public interest; or

(B) Any other expression or expressive conduct that involves petitioning the government or communicating views to members of the public in connection with an issue of public interest.[13]

"Thus," we have said, "the movant must make a prima facie showing that the claim at issue 'arises from' some form of speech—a 'written or oral statement' or other 'expression or expressive conduct'—of the specified character."[14] The term "arises from" means that there must be a "substantial connection" between the statutorily protected speech and the claim.[15] In other words, "the prima facie showing required to support a special motion to dismiss a claim under the District of Columbia Anti-SLAPP Act is a showing that the claim is based on the movant's protected activity, i.e., that such activity is an element of the challenged cause of action."[16]

---

[13] D.C. Code § 16-5501(1). The Anti-SLAPP Act defines an "issue of public interest" to "mean[] an issue related to health or safety; environmental, economic, or community well-being; the District government; a public figure; or a good, product, or service in the market place." D.C. Code § 16-5501(3). The definition goes on to state that "[t]he term 'issue of public interest' shall not be construed to include private interests, such as statements directed primarily toward protecting the speaker's commercial interests rather than toward commenting on or sharing information about a matter of public significance." *Id.*

[14] *Bronner*, 259 A.3d at 744.

[15] *Id.* at 746.

[16] *Id.* at 749.

The Post contends that Sonmez's claims concerning the restrictions ("bans") on her coverage of #MeToo news arise from "expressive conduct" within the meaning of Subsection 16-5501(1)(B) because those restrictions on Sonmez's assignments were acts of editorial discretion that enjoy protection under the First Amendment and therefore should be viewed as "expressive conduct." The trial court rejected this argument, reasoning that (1) the Anti-SLAPP Act "does not reach as broadly as the First Amendment"; and (2) the assignment decision in itself "is not speech" within the "highly specific" definition of the class of acts shielded by the Anti-SLAPP Act. In other words, the trial court found that the bans were not "expressive conduct that involve[d] . . . communicating views to members of the public in connection with an issue of public interest."

We agree with the trial court on each of these two points. To begin with, as we explained in *Bronner*, on their face the procedural protections provided by the Anti-SLAPP Act are not coterminous with the broad coverage of the First Amendment, but rather extend only to "certain categories of *speech*":

> D.C. Code § 16-5501(1) provides a highly specific definition of the class of acts that the Anti-SLAPP Act shields. It carefully limits that class to certain categories of *speech*, with the identified aim of protecting "the right of advocacy on issues of public interest." The narrowness and precision of the definition strongly indicates the legislature did not intend the Act's protections to stretch too far. We are led to conclude that the party filing a

special motion to dismiss a claim must show that some form of speech within the Anti-SLAPP Act's protection is the basis of the asserted cause of action. A legally objectionable aspect of the protected speech itself—e.g., that the speech is defamatory or otherwise tortious, or violates a contract's prohibition—therefore must be the subject of the claim or an element of the cause of action asserted.[17]

The legislative history of the Anti-SLAPP Act confirms that not all conduct protected by the First Amendment is entitled to the procedural protection afforded by the Act.  The initial draft of the Act was introduced in the Council of the District of Columbia in Bill 18-893 as the "Anti-SLAPP Act of 2010."[18]  As proposed, the new Act would have permitted a special motion to dismiss any claim arising from "an act in furtherance of the right of free speech," which was defined to include not only written or oral statements but also "any other conduct in furtherance of the exercise of the constitutional right to petition the government or the constitutional right of free expression in connection with an issue of public interest."[19]  But at the

---

[17] *Id.* at 746 (emphasis in the original).

[18] *See* 2010 Committee Report, Attachment 1.

[19] *Id.*, Attachment 1 at 1-2.

behest of the ACLU, which submitted comments on the bill, this language was modified in two pertinent respects.[20]

First, the ACLU recommended that the Act not use the term "Act in furtherance of *the right of free speech*" (emphasis added) to describe the conduct protected by a special motion to dismiss. It explained that "the right of free speech," as commonly understood, had "a broader meaning than the meaning given in this bill," and that to "avoid confusion" between that common meaning and "the special, narrower meaning given to it in this bill," a different term would be preferable. The ACLU suggested the term "Act in furtherance of the right of advocacy on issues of public interest."[21]

Second, the ACLU suggested a corresponding revision of the Act's definition of protected nonverbal conduct so as not to require a court to "determine whether given conduct is protected by the Constitution." In lieu of the language in the bill referencing the Constitution, the ACLU proposed that the "other" covered conduct be defined as "[a]ny other expression or expressive conduct that involves petitioning

---

[20] *See id.*, Attachment 2, Testimony of the American Civil Liberties Union of the Nation's Capital by Arthur B. Spitzer, Legal Director, on Bill 18-893, the "Anti-SLAPP Act of 2010."

[21] *Id.*, Attachment 2, at 4.

the government or communicating views to members of the public in connection with an issue of public interest."[22]

The Council accepted both these changes in Section 16-5501(1) of the Anti-SLAPP Act. Taken together, the changes demonstrate that the Act does not provide for a special motion to dismiss whenever the challenged conduct enjoys First Amendment protection, but only for conduct described by the Act's narrower definition of an "act in furtherance."

With regard to that definition, the Post suggests that where § 16-5501(1)(B) uses the word "involves," we should construe that word to mean "affects," so that the definition would cover any expression or expressive conduct that merely "affects" activities of "petitioning the government or communicating views to members of the public in connection with an issue of public interest." We decline to take that suggestion. It is true, as careful scrutiny of the full definition in an unabridged dictionary will confirm, that the word "involve" can have many different shades of meaning, depending on the context; and in some uncommon usages it can

---

[22] *Id.*, Attachment 2, at 5.

mean "affect."[23]   But in ordinary usage, the two words have materially different meanings.  Typically, the word "affect" as a verb is a broad term meaning to "act upon" or "influence" something, while the word "involves" means "includes" (listed in the dictionary as a synonym) or "employs."[24]  Section 16-5501(1)(B) plainly uses the word "involves" in the latter sense to specify the two narrow subcategories of expressive conduct to which the statute applies.  Substituting the rather vague word "affects" would dramatically and ambiguously enlarge the scope of the provision. The Post makes no argument to justify construing "involves" to mean "affects" in this context, and we see no justification for adopting such an uncommon construction.

So we turn to consider whether the restrictions that the Post imposed on Sonmez's reporting assignments—the bans—constituted "expressive conduct" of the specific kind specified in Subsection 16-5501(1)(B) of the Anti-SLAPP Act.  As relevant here, Subsection (B) imposes the minimum condition that such conduct

---

[23] The Post cites *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 274 (1995) ("[S]uch an interpretation, linguistically speaking, is permissible. The dictionary finds instances in which 'involve' and 'affect' sometimes can mean about the same thing." (citing 5 Oxford English Dictionary 466 (1st ed. 1933) (construing a provision of the Federal Arbitration Act concerning "a contract evidencing a transaction involving commerce"))).

[24] *See, e.g.*, the definitions of "involve" and "affect" in Webster's Third New International Dictionary of the English Language Unabridged (1993).

must "involve[] . . . communicating views to members of the public."[25]  The Act

does not protect "claims based on non-speech activities that are merely tangentially

related to protected speech."[26]  In addition, the requisite "public expression of

views"[27] must be "in connection with an issue of public interest."  But it is

undisputed that the Post imposed each of the "bans" on Sonmez without

communicating anything about them or the views underlying them to members of

---

[25] *See Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494, 503 (D.C. 2020) ("In order for Subsection B to apply, there must be evidence that appellees 'communicat[ed] views to members of the public.'"); *Fells v. Serv. Emp. Int'l Union*, 281 A.3d 572, 580 (D.C. 2022) ("[S]etting aside the 'issue of public interest' language . . . it is clear that advocacy refers to anything that is expressive and communicates views to members of the public.").

Even in First Amendment jurisprudence, symbolic and other nonverbal conduct is treated as equivalent to speech only when it is "inherently expressive," meaning that the conduct itself conveys an idea or message without the need of any speech accompanying it. *Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 66 (2006), *Texas v. Johnson*, 491 U.S. 397, 404 (1989). *See also Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995) (explaining that conduct is expressive and therefore protected by the First Amendment if a reasonable person would interpret the conduct as some sort of message given the context, even though "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message' . . . would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll"). (Unlike the Anti-SLAPP Act, though, the First Amendment does also afford at least some protection to activities that are related to, but not equivalent to, speech. *See, e.g., Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983); *Arcara v. Cloud Books*, 478 U.S. 697, 704 (1986)).

[26] *Bronner*, 259 A.3d at 747.

[27] *Fells*, 281 A.3d at 580.

the public.  Nor, of course, does Sonmez complain in her lawsuit about any such public disclosure of the bans or the Post's views relating to them; she complains about the bans themselves.  The mere institution of the bans inside the Post did not amount to a communication of them to the public.[28]  As the ACLU persuasively argues in its amicus brief in support of Sonmez on the Anti-SLAPP Act issue,

> A newspaper's behind–the-scenes work of choosing which reporter to assign to a story, to whatever extent it is protected by the First Amendment, is not covered by the Anti-SLAPP Act because the act of assigning a reporter does not itself "communicat[e] views to members of the public." Indeed, it may never be known to the public at all: the communication to the public—the byline of the reporter who writes an article—conveys to the reader only the name of the reporter who wrote the article, not that a different reporter was considered for the article and passed over for it, or that a reporter who had previously written on that subject had been pulled off the beat rather than, for instance, gone on vacation.[29]

Accordingly, we hold that the trial court properly denied the special motion to dismiss Sonmez's complaint for failure of that motion to make the prima facie

---

[28]  Indeed, we understand from Sonmez's complaint that there was no announcement of the restrictions on her reporting inside the Post either, requiring Sonmez herself to tell colleagues she was barred from working with them on stories every time the bans applied.

[29] Brief for the American Civil Liberties Union of the District of Columbia as Amicus Curiae In Support of Cross-Appellee Sonmez on the SLAPP Issue, at 11.

showing that Sonmez's claims arose out of an "act in furtherance of the right of advocacy on issues of public interest" within the meaning of the Anti-SLAPP Act.

## IV. The Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim on Which Relief Can Be Granted

We review de novo a trial court's dismissal of a complaint for failure to state a claim on which relief can be granted.[30] In doing so, we must take the well-pleaded factual allegations as true and construe the complaint in the light most favorable to the plaintiff.[31] To survive a Rule 12(b)(6) motion to dismiss, a complaint need only plead facts sufficient to state a claim that is "plausible on its face" rather than merely speculative or conceivable.[32] Facial plausibility is not an onerous test; it "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" supporting the claim.[33] If the complaint satisfies that low bar, it "may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."[34]

---

[30] *Williams v. District of Columbia*, 9 A.3d 484, 488 (D.C. 2010).

[31] *See, e.g.*, *Poola v. Howard Univ.*, 147 A.3d 267, 276 (D.C. 2016).

[32] *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[33] *Twombly*, 550 U.S. at 556.

[34] *Id.* (internal quotation marks omitted).

We consider first whether Sonmez's complaint plausibly alleges that the Post discriminated against her, in violation of the Human Rights Act, by taking adverse actions on the basis of her status as a sexual assault victim or her sex.  We then address the plausibility of Sonmez's allegations of hostile work environment and of retaliation in violation of the Human Rights Act.  Lastly, we address the Post's invocation of the First Amendment as a bar to Sonmez's complaint regarding the restrictions ("bans") imposed on her reporting of news involving claims of sexual misconduct.

### A.     Discrimination Based on Sonmez's Status as a Sexual Assault Victim or Her Gender

The Human Rights Act makes it "an unlawful discriminatory practice" for an employer to take adverse action against an employee "wholly or partially" on the basis of any of a number of protected attributes, including, as pertinent here, the employee's "sex" or "status as a victim . . . of . . . a sexual offense."[35]  There is no dispute that, as Sonmez alleges in her complaint, she is (and at all relevant times was) a member of both those protected classes.

The next question is whether Sonmez's complaint adequately alleges that the Post took sufficiently adverse actions against her to trigger the application of the

---

[35] D.C. Code § 2-1402.11(a).

Human Rights Act. In relevant part, the Act declares it unlawful for an employer to discriminate against an employee "with respect to his or her compensation, terms, conditions, or privileges of employment," or "to limit . . . his or her employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his or her status as an employee."[36] This court has understood this language to mean that a plaintiff must show that she suffered "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[37] Such a change arises only if the employee suffers "materially adverse consequences or objectively tangible harm."[38]

---

[36] D.C. Code § 2-1402.11(a)(1)(A).

[37] *Kumar v. District of Columbia Water & Sewer Auth.*, 25 A.3d 9, 17 (D.C. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

[38] *Barrett v. Covington & Burling LLP*, 979 A.2d 1239, 1251 (D.C. 2009) (quotation marks omitted); *see also Cesarano v. Reed Smith LLP*, 990 A.2d 455, 465, 467 (D.C. 2010). Sonmez cites *Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022) (en banc), in which the D.C. Circuit overruled prior case law and held that, under Title VII of the Civil Rights Act of 1964, once it has been established that an employer discriminated against an employee in that employee's "terms, conditions, or privileges of employment" because of a protected characteristic, "the analysis is complete" and the employee is not required to show any additional requirement such as "objectively tangible harm." *Id.* at 874-75. However, we are obliged to adhere to the construction of the District of Columbia Human Rights Act given in our prior decisions unless they are overturned by this court sitting en banc.

By contrast, purely subjective injuries, such as dissatisfaction with a reassignment, public humiliation, or loss of reputation, are not adverse actions."[39]

Sonmez's complaint charges that the following conduct constituted adverse employment actions taken because of her status as a sexual assault victim or her sex: "precluding and removing [her] from covering major stories involving sexual misconduct, suspending her for posting an article about Kobe Bryant's sexual assault allegations, failing to offer her the Post's security services when she was doxxed and threatened with rape and murder and giving her a lower annual rating and less compensation."

The Post concedes (and we agree) that Sonmez's allegations regarding the low score she received in April 2020 for her 2019 performance evaluation, which affected her compensation, satisfy the standard for an adverse employment action. The complaint's allegations concerning the second ban against coverage of stories

---

[39] *D.C. Dep't of Pub. Works v. D.C. Off. of Hum. Rts.*, 195 A.3d 483, 491 (D.C. 2018) (internal quotation marks omitted). We are not addressing here the elements of a hostile work environment claim. As we discuss *infra*, proof of psychological injury is relevant to a showing that harassment was serious enough to subject an employee to a hostile work environment, and under the Human Rights Act such an employee may be compensated for "embarrassment, humiliation, and indignity stemming from" the harassment. *Fred A. Smith Mgmt. Co. v. Cerpe*, 957 A.2d 907, 914 (D.C. 2008); *see also Ivey v. District of Columbia*, 46 A.3d 1101, 1110 (D.C. 2012).

involving sexual misconduct plausibly may satisfy that standard as well. As described by Sonmez, the second ban lasted for a prolonged period and allegedly meant that Sonmez "missed out on significant news stories . . . which would have elevated her professional profile[.]" If the evidence Sonmez is able to marshal supports that factual allegation, the second ban plausibly may qualify as a deprivation of employment opportunities or a reassignment with significantly different responsibilities resulting in materially adverse consequences (and not merely humiliation or other "purely subjective injuries") even though it did not formally change her designation, salary, or benefits as a national news reporter or preclude her from covering other significant news stories. "It is well-established that an employee's 'reassignment with significantly different responsibilities' can constitute an adverse employment action if it has 'materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.'"[40]

---

[40] *D.C. Dep't of Pub. Works*, 195 A.3d at 491 (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)). We therefore think it premature to conclude now, as our dissenting colleague is prepared to conclude, that Sonmez's reassignment "was not an actionable 'adverse employment action' under the District's Human Rights Act . . .because it was not a 'significant change' in [her] employment status." *Post* at 98-99 (quoting *Kumar*, 25 A.3d at 17).

In these respects, we are satisfied that the complaint sufficiently alleges adverse actions triggering the application of the Human Rights Act. On the other hand, the complaint does not plausibly allege that Sonmez's suspension in response to her tweets concerning Kobe Bryant (which we consider together with the Post's public statement that the tweets "displayed poor judgment that undermined the work of her colleagues") had materially adverse consequences for her or otherwise met the test for an adverse employment action serious enough to bring a claim of unlawful discrimination within the purview of the Human Rights Act. Sonmez does not allege that the suspension violated the terms of her employment. She was maintained on paid leave, the suspension lasted only two days, and it ended with a publicized determination that she did not violate the Social Media Policy and deserved no sanction. Numerous courts have held that "a simple paid suspension is not an adverse employment action."[41]

Lastly, while a failure to provide needed security services to which an employee is entitled might amount to an adverse employment action, Sonmez's complaint does not plausibly allege that the Post actually did withhold such services

---

[41] *Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1266-7 (11th Cir. 2021) (citing cases). We do not reject "the possibility that a paid suspension or accompanying investigation carried out in an exceptionally unreasonable or dilatory way may constitute an adverse employment action," *id.* at 1266, but Sonmez's complaint does not raise that possibility.

when she received online threats. All the complaint says on the subject is that Grant did not promptly contact the Post's security team when Sonmez was threatened, and instead urged Sonmez to ignore the threats, but that Sonmez nonetheless was in touch the same day with the Director of Security. Notwithstanding the complaint's description of Grant's disregard of protocol and seeming unconcern for Sonmez's safety, there are no particularized allegations that Sonmez was refused security services or that they were unavailable to her; that there were security measures that should have been offered or taken but were not; or that a lack of proper security precautions led to any adverse consequences for Sonmez.

We turn now to whether the complaint plausibly alleges that the Post discriminated against Sonmez on the basis of her status as a sexual assault victim or her sex when it took the cognizably adverse employment actions against her—the adverse performance evaluation and the second ban on her reporting news stories involving claims of sexual misconduct.

A plaintiff can allege discrimination with direct or circumstantial evidence. "Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question *without any need for inference. . .* [Such evidence] includes any statement or written document showing a discriminatory

motive *on its face*."[42]  There is direct evidence when the employer overtly refers to the employee's protected trait when making the adverse employment decision.[43]

In the present case, the complaint does not allege such overtly discriminatory statements by any of the defendants linking the challenged personnel actions to a prohibited motive, such as out-and-out admissions that Sonmez's reporting was restricted because she is a victim of a sexual offense or a woman.  Sonmez argues on appeal that certain alleged statements made by her editors did constitute direct evidence of discriminatory motivation based on her protected status—specifically, Barr's statement to Sonmez (when imposing the first ban) that "[t]he work you do intersects with what you have experienced in your life"; Ginsberg's comment that the accusations against Judge Kavanaugh were "too similar" to what Sonmez experienced in Beijing; Ginsberg's later remark that her pinned tweet regarding errors in the *Reason Magazine* article made him "uncomfortable"; the assertion in the warning she received that reporters should "remain in the audience"; and the explanation she was given attributing her low performance score to her "tweets defending herself" from the false claims related to her sexual assault.  While these alleged statements may support an inference of discriminatory intent, we do not

---

[42] *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 86 (D.D.C. 2006) (emphasis in original) (internal quotation marks omitted).

[43] *Mosleh v. Howard Univ.*, 2022 WL 898860, at *5 (D.D.C. 2022).

agree that they constitute *direct* evidence in themselves of discriminatory motivation. None of the statements explicitly refers to Sonmez's victimization or sex as itself a reason for disadvantaging her (though, admittedly, the first two statements in the list may be thought to come close) or otherwise clearly evinces a discriminatory motive without any need for inference.[44]

Sonmez also argues that the Post's expressed legitimate motivation for its bans—to avoid the appearance or perception of bias in its reporting that might be created by Sonmez's public stances and the publicity relating to her own victimization—is a direct expression of a discriminatory motive. We disagree. The proffered explanation is benign on its face, not explicitly about punishing Sonmez on account of her protected status (nor, as she has suggested,

---

[44] *Cf. Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576-77 (D.C. Cir. 2013) (holding that supervisor's alleged statement to employee denied a raise—that, "[f]or a young black man smart like you, we are happy to have your expertise; I think I'm already paying you a lot of money"—constituted direct evidence of discriminatory intent).

because she was responsible for a "disruption" at her workplace arising from that status[45]).

In the absence of direct evidence of a discriminatory motivation for an adverse personnel action, an employee alleging a Human Rights Act violation may rely on allegations of circumstantial facts from which a discriminatory motive may be inferred. In considering whether Sonmez's factual allegations suffice to support the inference of such a motive, we must bear in mind that the question has been raised not in a motion for summary judgment after the parties have had the opportunity to engage in discovery, but at the outset of the case in a motion to dismiss the complaint for failure to state a claim on its face. Where an employee's claims of intentional discrimination rely, at the summary judgment stage, on circumstantial rather than direct evidence linking the personnel action to a proscribed motive, we evaluate the claims utilizing the burden-shifting framework originally set forth by the Supreme

---

[45] D.C. Code § 2-1402.11(c-1)(1)(C) specifies that it is an unlawful discriminatory practice to take an adverse employment action against a victim of a sexual offense "based wholly or partially on the fact that . . . [a]n individual caused a disruption at the employee's workplace or made a threat to an employee's employment, relating to . . . a sexual offense . . . of which the employee . . . was a victim." Sonmez posits that this prohibition encompasses an adverse employment action attributable to her online harassment.

Court in *McDonnell Douglas v. Green*.[46]   Under that framework, "the burden

initially is on the employee to make a *prima facie* showing of discrimination . . . by

a preponderance of the evidence."[47]  If the employee makes that showing, the burden

is on the employer to rebut it by producing "admissible evidence" of a non-

discriminatory motivation for the challenged personnel decision.[48]  If the employer

does so, the burden shifts back to the employee, who "ordinarily must prove by a

preponderance of the evidence '*both* that the reason [offered by the employer] was

false, *and* that discrimination was the real reason.'"[49]  Alternatively, "the employee

may prevail by proving that the employer's action was motivated 'partially' by a

discriminatory reason, even if it also was motivated by permissible reasons not, in

themselves, pretextual."[50]  In the latter, "mixed motive" case, the employee need not

---

[46] 411 U.S. 792, 802 (1973); *see Furline v. Morrison*, 953 A.2d 344, 352 (D.C. 2008). The *McDonnell Douglas* test is inapplicable when the employee presents direct evidence of discrimination. *Id.* at 352 n.21.

[47]*Furline*, 953 A.2d  at 352 (citing *Hollins v. Fed. Nat'l Mortg. Ass'n* 760 A.2d 563, 571 (D.C. 2000)). "Broadly speaking, 'to state a *prima facie* claim of disparate treatment discrimination, the plaintiff must establish that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'" *Id.* at 352 n.24 (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).

[48] *Hollins*, 760 A.2d at 571.

[49] *Furline*, 953 A.2d at 353 (emphasis in original) (quoting *Hollins*, 760 A.2d at 571).

[50] *Id.* (quoting D.C. Code § 2-1402.11(a)).

show that the protected characteristic was a "but for" cause of the employer's adverse action, but only that it was "a substantial factor," meaning "a significant motivating factor bringing about the employer's decision."[51]  Conversely, the employer may defeat such a showing with proof that the illicit motive was insignificant, i.e., that the employer would have taken the same personnel action for non-discriminatory reasons alone.[52]

Here, however, it is premature to require either party to proffer probative evidence.  To survive the Rule 12(b)(6) motion to dismiss her Human Rights Act claim, Sonmez merely needed to plead facts that, when taken as true and construed in her favor, "provide a reason to believe" or "support a plausible inference" that her status as a victim of a sex offense or her sex was a substantial motivating factor in adverse actions taken against her by the Post.[53]  This pleading burden was less than the showing of "specific facts establishing a prima facie case of discrimination" that a plaintiff must make to survive a motion for summary judgment; nor, at this stage, was Sonmez required, in advance of discovery, to refute the employer's defenses as

---

[51] *Rose v. United Gen. Contractors*, 285 A.3d 186, 196-97 (D.C. 2022) (quotation marks omitted).

[52] *See id.* at 197 n.7 (citing *Harris v. City of Santa Monica*, 294 P.3d 49, 72 (Cal. 2013)); *Furline*, 953 A.2d at 353 n. 28.

[53] *Morris v. District of Columbia*, 313 A.3d 545, 550-51 (D.C. 2024) (quoting *Poola*, 147 A.3d at 280).

pretextual (though factual allegations contradicting or undermining the employer's assertion of a legitimate motivation may suffice to defeat the motion to dismiss).[54] In short, "at the pleadings stage of an employment discrimination case, a plaintiff has a '*minimal* burden' of alleging facts 'suggesting an inference of discriminatory motivation.'"[55] To quote *Twombly*, Sonmez was required to plead "only enough

---

[54] *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508, 510, 511 (2002) ("The prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement."); *see also Twombly*, 550 U.S. at 569-70, 586 ("[I]t should go without saying in the wake of *Swierkiewicz* that a heightened production burden at the summary judgment stage does not translate into a heightened pleading burden at the complaint stage") (Stevens, J., dissenting); *Brown v. Sessoms*, 774 F.3d 1016, 1023 (D.C. Cir. 2014) ("[a]t the motion to dismiss stage, the district court cannot throw out a complaint even if the plaintiff did not plead the elements of a prima facie case") (citation omitted); *Easaw v. Newport*, 253 F. Supp. 3d 22, 26-27 (D.D.C. 2017) ("At the motion to dismiss stage, . . . an employment discrimination plaintiff need not anticipate legitimate, non-discriminatory reasons that may be proffered by the employer for the adverse employment action nor allege pretext to survive a motion to dismiss."); *Savignac v. Jones Day*, 486 F. Supp. 3d 14, 30 (D.D.C. 2020) ("Where, as here, the defendant has proffered a legitimate non-discriminatory rationale for its actions—such as poor work performance—the plaintiff can survive a motion to dismiss by alleging that the employer's proffered reasons for the adverse employment actions were false, or that she was treated differently from similarly-situated employees outside the protected class.") (Internal citations, quotation marks, and brackets omitted).

[55] *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (emphasis in original) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)).

facts" as would suffice to "nudge[] [her] claims across the line from conceivable to plausible."[56]

The trial court held that the factual allegations in Sonmez's complaint do not support a plausible inference either that the Post's stated reason (as referenced in the complaint) was false or that discrimination was the real reason for the bans the Post imposed on her and the other employment actions she challenged.[57] If anything, the court concluded, the alleged facts make it "affirmatively implausible" that Sonmez's victim status or gender was a reason for the Post's decisions. "Most importantly," the court said, Sonmez alleged that "the Post hired her knowing that she was a victim of sexual assault and had publicly identified herself as a victim of sexual assault, and with this knowledge, the Post assigned her to stories involving sexual misconduct (including the Kavanaugh story)—until she made public statements that could be perceived as associating herself with the #MeToo movement as a victim herself." The court reasoned that "the only plausible inference" from Sonmez's allegations is

---

[56] *Twombly*, 550 U.S. at 570; *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) ("[s]pecific facts are not necessary" to survive a motion to dismiss).

[57] Among those actions, the court specifically listed Sonmez's two-day suspension with pay after her tweet concerning Kobe Bryant; a humiliating public statement by the Post that Sonmez had displayed poor judgment that undermined the work of her colleagues; the Post's alleged failure to respond to her request for security services when she was hit with a barrage of threats; and her lowered performance rating and consequently reduced compensation.

that "the Post's concern about the appearance of partiality raised by her public advocacy triggered the bans" and motivated the other challenged actions. That reason—"avoiding the appearance or a perception of bias by its reporters"—is a basis that "does not implicate" the Human Rights Act, the court held.

We agree that the factual allegations of the complaint can be understood to support the inference that the Post was motivated by legitimate concerns about Sonmez's objectivity and the appearance of bias in reporting on news stories involving disputed allegations of sexual assault because of her public statements about sexual assault. However, as has been explained, at this stage Sonmez does not have the burden of rebutting the Post's explanations as pretextual or insufficient. Moreover, viewing the complaint as we must, in the light most favorable to Sonmez, we find it does contain factual allegations that, taken all together, do plausibly cast doubt on the Post's claimed legitimate motives. And even if those motives were genuine, her factual allegations plausibly suggest that discrimination on the basis of Sonmez's protected status also was a motivating factor.

To begin with, in addition to the editors' statements that Sonmez argues amount to direct evidence of discriminatory animus, the complaint alleges several other instances in which Sonmez's editors said things to her that inferably evinced hostility, skepticism, or criticism based on her status as a victim of a sexual assault

or gender-based stereotypes.[58] These include the occasions when Wallsten allegedly asked Sonmez why she spoke out publicly about her assault and why she did not report it to the police in Beijing, and when Montgomery allegedly also asked Sonmez why she did not go to the police and commented that she was taught a woman should "just say no" if a man tries to assault her.[59] It is widely recognized that comments such as these are reflective of sex-based stereotypes—that not immediately reporting

---

[58] If an employer's inappropriate response to an employee's being raped was based on the employee's sex (i.e., the employer's reaction was driven by animus against women or they would have treated a male rape victim better than a female rape victim), that inappropriate response could be both discrimination based on status as a victim of a sexual offense and discrimination based on sex. *See Fuller v. Idaho Dep't of Corr.,* 865 F.3d 1154, 1167 n.13 (9th Cir. 2017) ("[A]n employer's actions undertaken because of a rape (whether in or outside of the workplace) might give rise to a reasonable inference of discrimination because of sex.") (internal quotations omitted).

[59] These and some of the other factual allegations we cite were in connection with the Post's actions in taking Sonmez off the story of the accusations against Judge Kavanaugh. As the parties agree, a claim based directly on those actions is time-barred. However, those actions still may be relevant for understanding the motives of the same editors in imposing the second ban and in its other subsequent actions, which were not time-barred when Sonmez filed her complaint.

or sufficiently resisting a sexual assault undermines the complainant's credibility and is proof that the assault did not occur or was not really assault.[60]

We also put in this category of statements suggesting stereotypical bias and hostility the allegations that Grant skeptically belittled Sonmez's concern to correct errors ("real or imagined," Grant called them) in the *Reason Magazine* article that publicly disparaged Sonmez's motives in accusing Kaiman of sexually assaulting her; that Grant chastised Sonmez for not having included Kaiman's claim that his

---

[60] *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-51 (1989) (explaining that it is sex discrimination for an employer to penalize an employee for failing to act according to sexist stereotypes and stating that remarks at work based on sex stereotypes can be evidence that gender played a part in a particular employment decision). *See, e.g.*, *Battle v. United States*, 630 A.2d 211, 217 (D.C. 1993) (acknowledging the prevalence of outdated "assumptions that sexual offense victims are generally lying and that the victim's failure to report the crime promptly is inconsistent with the victim's current statement that the assault occurred"); *State v. Hill*, 578 A.2d 370, 374-77 (N.J. 1990) (discussing how the law has long been shaped by the "sexist expectation[]" that delay in reporting rape undermines credibility, when in fact many cases of rape are not reported or are reported late because of women's fears about "the receptiveness of police, prosecutors, juries, and even friends and employers to a report that she was raped."); *Kebede v. Ashcroft*, 366 F.3d 808, 811 (9th Cir. 2004) (rejecting the stereotype that delay in reporting rape undermines credibility); *see also* Kimberly Peterson, *Victim or Villain?: The Effects of Rape Culture and Rape Myths on Justice for Rape Victims*, 53 Val. U. L. Rev. 467, 475-77 (2019) (describing as "prominent myths" the beliefs that "(1) victims often lie about being raped; (2) victims invite rape by their behaviors and actions; and (3) victims have a responsibility to protect themselves from rape"; and explaining the reasons why many sexual assault victims choose not to report the assaults); Janet A. Findlater, *Reexamining the Law of Rape*, 86 Mich. L. Rev. 1356, 1361-63 (1988) (discussing the stereotype that women who do not sufficiently resist assault are not really rape victims).

sexual encounter with her was consensual when she informed the L.A. Times and the FCCC that Kaiman had assaulted her; that Ginsberg essentially told Sonmez he believed the accusations against Judge Kavanaugh were "too similar" to Sonmez's own experience, and too upsetting to her, for them to count on Sonmez to report on the Kavanaugh story with the necessary fairness and objectivity; that Wallsten felt it necessary to remind Sonmez (a well-regarded reporter of breaking national news stories) that she needed to "write[] straight" a story concerning derogatory comments by President Trump about Judge Kavanaugh's accuser; and that Baron reportedly felt it necessary to insist, when he agreed to assign a female editor to cover a report involving sexual harassment allegations, that all decisions about the story be made strictly on the "basis of journalism."[61]  In the absence of other explanations, such statements as these plausibly suggest the stereotypical belief that women who

---

[61] The allegation in the complaint regarding Baron's ambiguous non-answer when asked in a meeting with newsroom employees whether murder and sexual assault are issues with "two sides" is also suggestive.

complain about rape are untrustworthy and that women cannot be objective even when discussing another woman's complaint of sexual assault or abuse.[62]

Striking, too, and for much the same reasons, are the allegations that Barr accused Sonmez to her face of being an "activist" who had "taken a side on the issue" of sexual assault and was "trying to have it both ways" by publicly disclosing her own victimization, criticizing news organizations like the L.A. Times for lack of transparency, and then continuing to report on the topic (or seeking to continue to do so). Significantly, Barr did not fault the quality of Sonmez's reporting, and his alleged reference to Sonmez being an "activist" on the "the issue" of sexual assault is confounding; that a victim of sexual assault stands up for her own rights, criticizes an inadequate inquiry into her own victimization, and objects to having her opportunities curtailed because she did so, does not make her an "activist" or constitute significant evidence of disqualifying bias. The statement Sonmez had made at that point (which her editors had pre-approved) did not state a position on a

_____

[62] *See Hill*, 578 A.2d at 376 (discussing long-held prejudices that women who complained about rape were deranged, emotional, and untrustworthy and therefore needed additional examination and stringent timeliness requirements when making claims against assailants); *cf. State v. Funk*, 799 N.W.2d 421, 436 (Wisc. 2011) (explaining that "the fact that a juror has been a victim of sexual assault does not make him or her per se biased against the defendant in a sexual assault case"); *see also Abshire v. State*, 642 So. 2d 542, 543-45 (Fla. 1994) (vacating guilty verdict and death penalty because of improper use of peremptory strikes against women because "they tend to be more, more emotional than the other people").

general "issue" relating to the #MeToo movement; rather, it mostly referred to Sonmez's own alleged assault by Kaiman and its investigation. (While Sonmez did note that institutions play a role in combatting sexual misconduct, that was hardly controversial; as the Post agrees in its brief on appeal, "everyone condemns sexual assault.") Sonmez did not express solidarity with sexual assault complainants in general, but only with the other woman with whom she shared the same assailant and whose example encouraged Sonmez herself to come forward. Based on her allegations, Sonmez was not an "activist" and would not likely have been perceived as one solely on the basis of her public statement.

Add to this the editors' alleged assertion, included in the written warning they gave Sonmez, that by defending herself from false or misleading allegations in the *Reason Magazine* article and reacting to personal attacks online, she was actively trying to be "the star" and "to make the news." So far as appears from the complaint, the Post's editors had no good reason to disbelieve Sonmez's sexual assault claim, and they never identified such a reason. And there is no suggestion (nor has the Post claimed) that the content of Sonmez's pinned Twitter post contained general advocacy regarding #MeToo, rather than just a factual response to specific mischaracterizations of her own report of rape and her motives.

A reasonable fact finder fairly could infer that the editors' alleged concern with Sonmez's objectivity based on her public statements was pretextual, and that Barr's alleged denunciation of a sexual assault victim and the rhetoric of the warning given Sonmez were so unjustified in the circumstances as to be indicative of stereotypical bias against women who claim to have been sexually assaulted.

The complaint also contains other factual allegations that reasonably could suggest pretext by undercutting the Post's professed concern that Sonmez's public statements about her sexual assault would endanger the perceived objectivity of its reporting on #MeToo matters.

First, when the L.A. Times concluded its investigation of Kaiman and he resigned, Grant allegedly told Sonmez to expect online attacks and encouraged Sonmez to prepare a public statement with the Post's help. Even though Sonmez's editors knew she had been writing news stories dealing with sexual misconduct issues, and even after Sonmez had filed a story on the accusations against Judge Kavanaugh (for which she had received positive feedback), the Post reviewed and approved Sonmez's statement. And no one suggested to Sonmez that issuing it would raise issues of her objectivity in reporting on sexual misconduct stories or preclude her assignment to such stories.

Second, per the facts alleged in the complaint, when Sonmez's editors *initially* explained to her why she was being taken off the Kavanaugh story, they did not say it was because she had taken a side on the "issue" of sexual assault, that her reporting on that issue would present the appearance of a conflict of interest, that it was necessary for the Post to avoid the perception that it had an advocate reporting on an issue she had experienced, or anything like that. According to the complaint, it was only after Sonmez objected in writing to the stereotypical assumption of her incapacity to handle the reporting given her own experience that the editors revised their explanation and (after Barr questionably denounced Sonmez as a biased "activist") Ginsberg first raised the concern with "the appearance of a conflict of interest."

Barr then elaborated that "[w]e don't have reporters who make statements on issues they are covering. We don't want the external perception that we have an advocate covering something she has experienced." The complaint effectively alleges that this assertion was untrue, and not just because the editors, aware that Sonmez had covered #MeToo stories, approved her public statement regarding the L.A. Times investigation of Kaiman. The complaint also cites the Post's support for Sonmez's colleague, Michelle Ye Hee Lee. Although Lee is an Asian-American who spoke out publicly against anti-Asian discrimination and violence (and criticized the news media's inadequate coverage of such harassment), the Post

allowed her to continue reporting on anti-Asian violence and to appear on CNN to discuss the subject. The contrast with the Post's treatment of Sonmez is stark. Instead of telling Lee that "we don't have reporters who make statements on issues they are covering" and that she was acting as "an activist" who "took a side on the issue" and created "the appearance of a conflict of interest," the editors praised Lee as a "stellar journalist" *because* of her advocacy on issues of anti-Asian hate. This disparate treatment could plausibly suggest discrimination based on Sonmez's protected characteristics—while the Post (in at least some publicized instances) considered having a certain identity and speaking out against discrimination and violence against that identity as a source of credibility in its reporters, it considered being a female sex assault victim and speaking out against discrimination against such victims to have the opposite effect.

Moreover, the complaint also alleges that Grant objected when Sonmez understandably wanted to convey the "conflict of interest" explanation to her colleagues in order to explain why she was taken off the Kavanaugh story—an objection that reasonably could be viewed as casting doubt on the veracity of the rationale and suggesting there was, in truth, something improper about the ban. Other allegations also could plausibly suggest that editors knew their actions were wrongful and therefore tried to keep their real motives hidden. For example, when Ginsberg asked Sonmez to take down her pinned post because it made him

"uncomfortable," he allegedly refused to put his request in writing, did not cite any company policy about objectivity or social media, and did not explain the reason he was uncomfortable with the post. Later, Grant allegedly told Sonmez to stop taking notes at a meeting about her purported Social Media Policy violation because "our words could be used against us." How so, exactly?

Third, the complaint alleges that the Post discontinued the "first ban" immediately after the November 2018 mid-term elections, allowing Sonmez to resume covering #MeToo-related news stories despite her supposed conflict of interest. The seeming inconsistency of this decision, which the Post (allegedly) made without explaining it, also raises a question as to the actual motivation behind the ban. If the motive genuinely was to avoid an appearance of bias in reporting on #MeToo matters, it is hard to see why the conclusion of the elections dispelled that concern.

Fourth, the complaint alleges that in August 2019, after Sonmez posted her request for correction of the *Reason Magazine* article on her Twitter account, none of her editors indicated that her post violated the Post's Social Media Policy or was problematic for any reason. It was only ten days later, on September 4, after Sonmez was criticized by a prominent writer and defender of Kaiman, and Sonmez then started receiving online abuse from some Twitter users who supported Kaiman and

blamed his accusers, that Ginsberg and Montgomery reimposed the ban on Sonmez's coverage of any #MeToo-related topics. The editors still did not say or imply that Sonmez had violated any Post policy. These allegations may be taken to suggest that Sonmez's pinned tweet and her speech about her victimization were insufficient to motivate the ban, and that it was only when that speech triggered disruptive sex victim-based abuse that the editors decided to ban Sonmez from reporting on news stories involving sexual victimization. Sonmez plausibly alleges that this contravened the Human Rights Act provision making it an unlawful discriminatory practice to impose an adverse employment action on an employee because outside individuals "caused a disruption at the employee's workplace . . . relating to . . . a sexual offense."[63]

Fifth, the complaint alleges that it was one month later, in October 2019, that Ginsberg instructed Sonmez to remove her posted tweet seeking correction of the *Reason Magazine* article (because it made him "uncomfortable") and to clear all future contemplated posts about her assault with her editors in advance. Since this

---

[63] D.C. Code § 2-1402.11(c-1)(1)(C). Sonmez also argues that an employer cannot justify a discriminatory practice as necessary to cater to customers' discriminatory preferences. *See Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1276-77 (9th Cir. 1981); *see also* D.C. Code § 2-1401.03 ("[A] 'business necessity' exception cannot be justified by . . . the preferences of co-workers, employers, customers or any other person.").

took place *after* Sonmez was again barred from covering #MeToo-related news, it would seem it had nothing to do with preserving the appearance of objectivity in her coverage of such news. Moreover, it appears from the complaint that Ginsberg never had any valid objection to Sonmez's defensive post. Although Sonmez later was given a written warning that she had violated the Post's Social Media Policy by defending herself online, her complaint alleges that the policy did not address her conduct and was being enforced arbitrarily and disparately.[64] This allegation was substantiated. The Washington Post Guild protested the Post's resort to its "vague and inconsistently enforced" Social Media Policy to "control" Sonmez both in the October 2019 warning she received and when the Post later publicly shamed Sonmez for (supposedly) violating the policy by her tweets concerning Kobe Bryant. Within two days of the latter incident, the Post quietly concluded that Sonmez's tweets in fact did not violate the Social Media Policy. (But the Post nonetheless did not retract its public admonishment of Sonmez or apologize to her.) In the absence of a valid explanation for twice invoking the inapplicable Social Media Policy against Sonmez, a plausible inference is that its invocation was pretextual, and that the

---

[64] As previously discussed, the explanation given to Sonmez in the warning—that "reporters should make every effort to remain in the audience, to be the stagehand rather than the star, to report the news, not to make the news"—appears to be unconnected with the Social Media Policy and so inappropriate to the defensive conduct at issue that, in itself, it plausibly suggests a discriminatory motivation was at work.

underlying motive in each instance was a discriminatory animus against women and victims of sexual assault.

Sixth, Sonmez thereafter was told that she received a lower performance rating because she had defended herself online from the allegations in the *Reason Magazine* article. Here, too, the justification for the adverse action is elusive given that Sonmez did not violate the Post's Social Media Policy, leaving the plausible inference of a discriminatory animus at work.

Seventh, the complaint alleges that the Post abruptly lifted the "second ban" after it received publicity in *Politico*. It is reasonable to think that the Post would not have done this if it truly was concerned about preserving readers' confidence in the objectivity of Sonmez's reporting on #MeToo-related matters.

For the above reasons, we conclude that Sonmez's complaint does not fail to state a plausible claim that the defendants took adverse employment actions against her wholly or partially because she is a woman and/or a victim of sexual assault. Counts I and II of the complaint, which allege such discrete discriminatory actions, should not have been dismissed for facial insufficiency.

**B.      Subjection of Sonmez to a Hostile Work Environment**

Count IV of Sonmez's complaint alleges that the defendants also violated the Human Rights Act by subjecting her to a hostile work environment through discriminatory harassment and abuse.  The trial court dismissed this count for the same reason it dismissed Counts I and II, that the complaint's factual allegations did not support an inference of discriminatory intent on the part of the defendants.  Since we conclude otherwise, we cannot uphold the dismissal of Count IV on that ground.  However, the Post contends that Count IV was properly dismissed as a matter of law on a different ground (which the defendants raised in the trial court but which that court found it unnecessary to reach); namely, that the complaint does not plausibly allege harassment severe or pervasive enough to amount to a hostile work environment in violation of the Human Rights Act.  We proceed to address this contention, for as an appellate court, we may affirm the trial court "on any valid

ground, and need not follow the same mode of analysis" as the trial court employed.[65]

There is a "fundamental difference" between a claim based on a discrete discriminatory act and a hostile work environment claim, which is based on "a series of separate acts" of harassment (none of which needs be actionable on its own) that "collectively constitute one unlawful employment practice."[66] To assert a hostile work environment claim under the Human Rights Act, as under Title VII, an employee must plausibly allege that she was subjected to "severe or pervasive" harassment based on her membership in a protected class.[67] The series of acts giving rise to the alleged hostile environment must be of such severity or pervasiveness as

---

[65] *Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015) (upholding dismissal of complaints for failure to state a claim of retaliatory hostile work environment rather than on the grounds of issue preclusion and untimeliness that the trial court relied on; quotation marks omitted); *see also, e.g., Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 735 n.14 (D.C. 2000) ("It is well settled that an appellate court may affirm a decision for reasons other than those given by the trial court.").

[66] *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 889-90 (D.C. 2003) (en banc) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002) (quotation marks omitted)).

[67] *See id.* at 888 (stating that in order to state a viable hostile work environment claim, a plaintiff must demonstrate that (1) she is a member of a protected class, (2) she was subjected to unwelcome harassment, (3) the harassment was based on membership in the protected class, and (4) the harassment is severe and pervasive enough to affect a term, condition or privilege of employment).

to "alter the conditions of [the victim's] employment and create an abusive working environment," to the degree that the workplace is "permeated [with] discriminatory intimidation, ridicule, and[/or] insult,"[68] or is otherwise transformed into a comparably toxic, discriminatory milieu on a day-to-day basis. The plaintiff must "demonstrate both an objectively hostile or abusive environment, i.e., one that a reasonable person would find hostile or abusive, and a subjective perception by the plaintiff that the environment is abusive."[69]   In determining whether alleged harassing conduct was severe or pervasive, we must look at "all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is

---

[68] *D.C. Dep't of Pub. Works v. D.C. Off of Hum. Rts.*, 195 A.3d 483, 495 (D.C. 2018) (brackets, ellipses, quotation marks, and citations omitted); *see also, e.g.*, *Lively*, 830 A.2d at 889 (quoting *Daka, Inc. v. Breiner*, 711 A.2d 86, 93 (D.C. 1998)).

[69] *Lively*, 830 A.2d at 889. (quoting *Daka, Inc.*, 711 A.2d at 93).  Hostile work environment plaintiffs are not required, however, to prove that they suffered "actual psychological injury." *Id.*

physically threatening or humiliating, or [instead] a mere offensive utterance; and whether it interferes with an employee's work performance."[70]

The severity/pervasiveness requirement is meant to be "demanding" and to "filter out complaints attacking 'the ordinary tribulations of the workplace'"; "conduct must be extreme to amount to a change in the terms and conditions of employment."[71] Thus, as numerous cases have held, a plaintiff typically must allege more than obnoxious "offhand comments," "isolated incidents," "sporadic use of abusive language," and the like.[72] Similarly, "[a]llegations of undesirable job assignments or modified job functions" and lowered performance evaluations are

---

[70] *Id.* at 890 (quotation marks omitted). We recognize that there are rare cases in which a single egregious act or incident by itself can be enough to establish a hostile work environment. *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (opining that a supervisor's use of "a deeply offensive racial epithet when yelling at [an employee] to get out of the office . . . might well have been sufficient to establish a hostile work environment" without more); *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment . . . than the use of an unambiguously racial epithet . . . by a supervisor in the presence of his subordinates." (Internal quotation marks and citation omitted)). We do not perceive the present case to fall in this exceptional category.

[71] *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted).

[72] *Id.*; *see also, e.g.*, *Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015) ("occasional name-calling, rude emails, lost tempers and workplace disagreements [constitute] the kind of conduct courts frequently deem uncognizable under Title VII").

ordinarily insufficient to plead the requisite degree of severity to show that the plaintiff was subjected to a hostile work environment, upsetting to an employee as they may well be.[73] And although allegations of discrete acts of discrimination or retaliation may support a claim of actionable adverse employment actions in themselves, such allegations ordinarily do not support a hostile work environment claim unless they also are "connected to a pervasive pattern of severe harassment."[74]

We agree with the Post that Sonmez's well-pleaded factual allegations, accepted at this stage as true, fall short of meeting the foregoing requirements for

---

[73] *Houston v. SecTek, Inc.*, 680 F. Supp. 2d 215, 225 (D.D.C. 2010); *see also, e.g.*, *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.C.C. 2009) ("Nor can the removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management be characterized as sufficiently intimidating or offensive in an ordinary workplace context."); *Munro v. LaHood*, 839 F. Supp. 2d 354, 366 (D.D.C. 2012) ("[C]ourts typically do not find these types of 'work-related actions by supervisors' to be sufficient for a hostile work environment claim" (citations omitted)); *Hussain v. Gutierrez*, 593 F. Supp. 2d 1, 7 (D.D.C. 2008) ("[C]omplaints over undesirable job responsibilities and office arrangements do not support a hostile work environment cause of action."); *Laughlin v. Holder*, 923 F. Supp. 2d 204, 216, 221 (D.D.C. 2013) (dismissing hostile work environment claim alleging denial of promotion and bonuses, interference with job duties, and manipulation of performance reviews).

[74] *Massaquoi v. District of Columbia*, 81 F. Supp. 3d 44, 53 (D.D.C. 2015); *see also Nurriddin*, 674 F. Supp. 2d at 94 (dismissing plaintiff's hostile work environment claim because plaintiff only sought "to transform his challenges to discrete acts of alleged discrimination or retaliation . . . into a hostile work environment claim by combining those events with a series of ordinary workplace difficulties").

pleading that she endured a hostile work environment.[75]   To begin with, the complaint does not allege that the Post or any of its employees subjected her to "intimidation, ridicule, or insult" or anything resembling such abuse.  The complaint cites only a few isolated questions or remarks relating to her sexual assault during the three-year period covered by the complaint—for example, that Wallsten and Montgomery asked why she did not report Kaiman's assault to the police, and that Grant chastised her for not acknowledging that Kaiman claimed their sexual encounter was consensual.  In addition, in support of her hostile work environment claim, Sonmez cites her two-day investigatory suspension with pay after her tweet about Kobe Bryant (which resulted in Sonmez's prompt exoneration) and Grant's publicly reported statement that her tweets "displayed poor judgment," along with the disciplinary warning and lower performance evaluation that she received.  We do not minimize these discrete offensive incidents, and we acknowledge that in some cases a multitude of individually small instances of hostility can add up to create an intolerable situation for an employee.  Nonetheless, we are not persuaded that the

---

[75] "[A] hostile work environment claim concerns a single unlawful practice which is treated as an individual whole for purposes of the limitations period, even if an initial portion of that claim accrued outside the limitations period." *Lively*, 830 A.2d at 892. Accordingly, in assessing the sufficiency of Sonmez's allegations, we take into account alleged components of her hostile work environment claim that occurred early in her tenure at the Post and outside the one-year statute of limitations governing claims under the Human Rights Act, such as the first ban on her coverage of the Kavanaugh story and other #MeToo-related matters.

complaint plausibly alleges that the cited actions in this case, taken together, were severe or pervasive enough to transform Sonmez's workplace into what is understood to be a hostile work environment.

Of course, we also must take into consideration the two periods when Sonmez was precluded from covering news stories involving claims of sexual misconduct. As we have explained, the complaint plausibly alleges that these "bans" were, by themselves, discriminatorily motivated adverse actions in violation of the Human Rights Act. But that does not mean the bans contributed meaningfully to the creation of a hostile work environment. While the limited curtailment of her writing assignments certainly was unwelcome to Sonmez and allegedly denied her the opportunity to report on some important stories, it was not stigmatizing or carried out in an abusive or otherwise toxic manner. Moreover, the assignment limitations did not alter Sonmez's compensation, benefits, hours, or basic job responsibilities. Sonmez remained a full-time reporter in good standing on the national breaking political news team, and there is no allegation that she was barred from covering significant stories as a general matter. Although Sonmez alleges (and we accept as true for present purposes) that the bans caused her stress and humiliation because they "requir[ed] her to repeatedly explain to her colleagues that she was unable to write stories because she was a victim of a sexual offense," the bans were not

*objectively* severe or pervasive enough to contribute to the creation of what is meant by a hostile work environment.[76]

Finally, Sonmez argues that the third-party harassment, threats and abuse on Twitter that she experienced and describes in her complaint contributed to the creation of a hostile workplace environment, along with the alleged failure of the Post to offer her its security services when she was doxxed and her safety was threatened. As the Post points out, Sonmez did not present an argument of employer liability for the abusive actions of third parties online to the trial court, and "[w]e ordinarily do not consider issues raised for the first time on appeal."[77] But exercising our discretion to consider the contention, we find it deficient. We see no basis on which to hold an employer liable for online harassment of an employee by unrelated third parties that the employer did not provoke, sanction, or have the ability to prevent or control. This is simply not a case in which the employer could be held liable for third-party harassment occurring in its workplace because it knew or should have known of the harassment and had the ability to take prompt remedial

---

[76] *Cf. Baird v. Gotbaum*, 792 F.3d 166, 172 (D.C. Cir. 2015) (holding that although plaintiff alleged that her employer's actions "took a serious toll on her emotional and physical health," that fact was "insufficient on its own" because the challenged actions did not satisfy the objective standard for severity and pervasiveness).

[77] *Sewell v. Walker*, 278 A.3d 1175, 1177 (D.C. 2022) (citation omitted).

action to end it but neglected to do so.[78]  And as we have already explained, the factual allegations of Sonmez's complaint fail to substantiate her claim that the Post withheld its security services when it learned that she was threatened online after she posted her tweet relating to Kobe Bryant.  All the complaint alleges is that Sonmez stayed safe at a hotel and was in touch that evening with the security department.  It does not allege any failure on the part of that department nor, indeed, anything the department did or failed to do to protect her.

For the foregoing reasons, we affirm the trial court's dismissal of Count IV, the hostile work environment count in Sonmez's complaint, for failure to state a claim on which relief can be granted.

## C.    Retaliation Against Sonmez

The Human Rights Act makes it unlawful for an employer to retaliate against an employee who "has opposed any practice" of unlawful discrimination.[79]  An employee may plead such a retaliation claim by alleging in her complaint that (1) she

---

[78] *See Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 422-23 (4th Cir. 2014) (adopting "a negligence standard for analyzing an employer's liability for third-party harassment under Title VII[,]" and holding that "an employer is liable under Title VII for third parties creating a hostile work environment if the employer knew or should have known of the harassment and failed to take prompt remedial action reasonably calculated to end the harassment" (quotation marks omitted)).

[79] D.C. Code § 2-1402.61(b).

engaged in protected activity by opposing or complaining about employment practices that are unlawful under the Act; (2) her employer took an adverse personnel action against her; and (3) there was a causal connection between the protected activity and the adverse action.[80]

To satisfy the first requirement, the employee need only have had "a reasonable good faith belief that the practice she opposed" was prohibited by the Human Rights Act.[81] But "the onus is on the employee to clearly voice her opposition to illegal discrimination; a vague charge of discrimination will not support a subsequent retaliation claim."[82] "It is not enough for an employee to object to favoritism, cronyism, violation of personnel policies, or mistreatment in general, without connecting it to membership in a protected class, for such practices, however repugnant they may be, are outside the purview of the DCHRA."[83] Similarly, the

---

[80] *Vogel v. District of Columbia Off. of Plan.*, 944 A.2d 456, 463 (D.C. 2008). "Such a *prima facie* showing gives rise to a presumption that the employer's conduct was unlawful, which the employer may rebut by articulating a legitimate reason for the employment action at issue." *Id.*

[81] *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 586 (D.C. 2001); *see also Propp v. Counterpart Int'l*, 39 A.3d 856, 863 (D.C. 2012) ("An employee is protected from retaliation even if the employer's conduct alleged to be discriminatory is lawful, so long as the employee reasonably believed the employer's action was discriminatory.").

[82] *Vogel*, 944 A.2d at 465 (internal quotation marks and footnote omitted).

[83] *Id.* at 464.

use of words like "bias," "prejudice," and "hostile work environment," if "untethered to an allegation that the conduct occurred because of membership in a protected class, is not enough to transform a workplace complaint into protected activity."[84] "[T]he [employee] must alert the employer that she is lodging a complaint about allegedly [unlawful] discriminatory conduct. Employer awareness that the employee is engaged in protected activity is thus essential to making out a prima facie case of retaliation."[85]

The second requirement of an adverse personnel action by the employer is satisfied if "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[86] Thus, it is said that "a materially adverse action for . . . a retaliation claim . . . encompasses a broader range of actions" than the term "adverse action" does for discrimination claims.[87]

---

[84] *Clemmons v. Acad. for Educ. Dev.*, 107 F. Supp. 3d 100, 130 (D.D.C. 2015).

[85] *Howard Univ. v. Green*, 652 A.2d 41, 46 (D.C. 1994) (footnote omitted).

[86] *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted).

[87] *Richardson v. Petasis*, 160 F. Supp. 3d 88, 134 (D.D.C. 2015).

The third causal connection requirement is satisfied if the employer's actions were "motivated in substantial part by retaliatory reasons, even if they were motivated also by legitimate business reasons."[88] In the absence of direct evidence of retaliation, "[t]he causal connection between the protected activity and the adverse employment action can be established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment[.]"[89] Protected activity can be followed by discriminatory treatment when the allegations show temporal proximity,[90] a pattern of antagonism,[91] or that the employee was treated differently after the protected conduct.[92]

---

[88] *District of Columbia v. Bryant*, 307 A.3d 443, 452 (D.C. 2024) (quoting *Propp v. Counterpart Int'l*, 39 A.3d 856, 870 (D.C. 2012) (emphasis omitted)).

[89] *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).

[90] Temporal proximity between an employee's exercise of rights and the employer's alleged retaliation can alone be sufficient to plead causation. *Nicola v. Wash. Times Corp.*, 947 A.2d 1164, 1175 (D.C. 2008). On the other hand, "temporal proximity, though often an indicator of causation, is not a *required* element of a retaliation claim, particularly at this stage of the proceedings." *Dave v. Lanier*, 606 F. Supp. 2d 45, 52-53 (D.D.C. 2009) (emphasis added).

[91] "[R]epeated, escalating acts of retaliation," such as "internal complaints"; "threats that [the employee] would be terminated"; and "formal action . . . to reduce [her] duties" can constitute a pattern of antagonism supporting an inference of causation. *Payne v. District of Columbia*, 4 F. Supp. 3d 80, 90 (D.D.C. 2013) (vacated on other grounds).

[92] "[W]here an employer treats an employee differently after she asserts her rights . . . than before she had done so, a retaliatory motive may be inferred." *Cantrell v. Nissan N. Am., Inc.*, 145 Fed. App'x. 99, 105-06 (6th Cir. 2005).

Sonmez claims she plausibly alleged that the Post retaliated against her for opposition to unlawful discrimination that she voiced on three occasions. The first occasion was in September 2018, when, in an email to her editors, she objected to being removed from covering the Kavanaugh story "based on what happened to me in Beijing" (meaning her sexual assault). At that time, however, sexual assault victims were not a protected class under the Human Rights Act.[93] Nor did Sonmez assert or profess to believe that discrimination against sexual assault victims was unlawful when she raised her objection. It seems clear that Sonmez did not say enough to alert her employer that she was objecting to discrimination based on a protected characteristic.[94] But we need not decide that issue, because even if we were to conclude that Sonmez's email was protected activity, this claim of retaliation fails for a different reason.

---

[93] As the trial court noted, it was only in 2019 that the Act was amended to prohibit discrimination against victims of sexual assault. *See* Employment Protections for Victims of Domestic Violence, Sexual Offenses, and Stalking Amendment Act of 2018, § 2(a), D.C. Law 22-281 (effective April 11, 2019).

[94] Sonmez has argued that discrimination against female victims of sexual assault is a subcategory of gender discrimination, which the Human Rights Act does prohibit. Whatever the merits of that argument, it does not persuade us that her September 2018 email, which said nothing about gender or sex discrimination, made her editors aware that she was objecting on that basis. But as we say, this retaliation claim fails for another reason.

In rejecting a retaliation claim based on Sonmez's September 2018 objection, the trial court observed that Sonmez did not allege any retaliatory actions during the two months between that objection and the termination of the first ban on November 7, 2018. However, Sonmez's complaint can be read to imply that it was after she sent her email that her editors extended the first ban to apply to other news involving sexual misconduct claims besides the Kavanaugh story. We suppose that extension would suffice to constitute a sufficiently adverse action to support a retaliation claim. In any event, though, as the trial court also ruled, any plausible claim of retaliation for Sonmez's objection in September 2018 was time-barred by the applicable one-year statute of limitations when she filed her complaint in Superior Court in July 2021. While Sonmez's complaint about the institution of the *second* ban was not time-barred at that point, we agree with the trial court that "it is not plausible to infer that the Post imposed the second ban because of Ms. Sonmez's complaints about the first ban about a year earlier, given that the Post had ended the ban and assigned her to #MeToo-related stories in the meantime."

Sonmez next claims that her objection to the second ban on September 4, 2019, constituted protected activity that led to retaliatory adverse actions.[95]

---

[95] As the trial court noted, Sonmez alleges that she again protested the second ban in May 2020, but she does not allege an adverse employment action after that date.

Sonmez's complaint alleges only that, upon being informed that the Post was reimposing the ban, she "vehemently protested the ban for essentially the same reasons she protested the first ban." Although this allegation is vague, we are prepared to accept that—since it does reference the earlier protest—it passes muster for the purpose of establishing (at the pleading stage) that Sonmez complained that the Post was discriminating against her based on her status as a sexual assault victim. And by this time the Human Rights Act had been amended to prohibit discrimination against victims of sexual assault.

Even so, as the trial court concluded, Sonmez did not allege facts supporting a plausible inference of a causal connection between her objection to the second ban and any subsequent adverse actions by the Post. Sonmez cites as causally related adverse actions (1) the written warning she received on October 17, 2019, for (supposedly) violating the Post's Social Media Policy by maintaining her pinned tweet to defend herself from false accusations regarding her sexual assault; (2) the insufficient security protection she allegedly received after her Kobe Bryant post on January 26, 2020; and (3) the low performance rating she received in April 2020 that affected her compensation. While it is plausible that the threat of each of those measures by an employer would dissuade a reasonable employee from making a charge of discrimination and therefore the measures should be viewed as adverse actions sufficient to amount to retaliation, we cannot reasonably infer the necessary

causal nexus between Sonmez's opposition to the second ban as discriminatory and any of those adverse actions.[96]

First, while Sonmez was given the warning only a month and a half after she objected to the second ban, her complaint itself states that the Post issued the warning not because of her protest, but because of her subsequent refusal to take down her August 25, 2019, Twitter post responding to the *Reason Magazine* article. The warning itself cited that pinned tweet as the basis for its issuance. The complaint specifically alleges that "the Post disciplined Ms. Sonmez for making herself the 'star' of her own sexual assault and for criticizing other news organizations" by posting the tweet. The complaint does not plausibly suggest that Sonmez's objection to the second ban was a reason for the warning.

The complaint also specifically alleges that "[t]he basis for the low [performance] score was Ms. Sonmez's tweets defending herself from false claims related to her sexual assault," not her objection approximately nine months earlier

---

[96] Sonmez also alleges that, a month after she opposed the second ban, the Post increased its scrutiny of her use of social media. We are not persuaded that this allegation describes a materially adverse employment action. In addition, we do not overlook other actions taken by the Post against Sonmez, such as her two-day suspension after she posted about Kobe Bryant. We are satisfied that none of those are plausibly alleged to be causally related to Sonmez's objection to the imposition of the second ban.

to the imposition of the second ban. Here too, and even setting aside the considerable time that passed between the objection and the adverse performance review,[97] the complaint does not plausibly allege a causal connection between the two events.

As to the allegedly insufficient security protection provided to Sonmez by the Post, we agree with the trial court that "there is not close [enough] temporal proximity between her complaint about the second ban in September 2019 and . . . the Post's actions in the wake of her tweet about Kobe Bryant in late January 2020" to plausibly infer causality, especially given the intervening events.[98] No plausible causal linkage is evident from the factual allegations in Sonmez's complaint.

Finally, Sonmez contends that her refusal in October 2019 to take down her pinned tweet at Ginsberg's urging constituted protected activity that led to the

---

[97] We do not agree that temporal proximity is necessary to infer a causal connection to the performance review. Because it was an annual review, the adverse action was presumably as close to the protected activity as was possible for that type of action. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) (explaining that an inference of causation is strengthened when the adverse action is taken at the "first actual opportunity").

[98] *See Johnson v. District of Columbia*, 935 A.2d 1113, 1120 (D.C. 2007) ("a stretch of four months realistically cannot constitute temporal proximity in the ordinary sense of that phrase"); *Vogel*, 944 A.2d at 462 (where five months passed between the employee's complaint and termination, "a nexus between the two events could not be inferred from their temporal proximity alone").

warning two weeks later that she was violating the Post's Social Media Policy and to the Post's subsequent adverse actions. Sonmez argues that her refusal to remove the tweet was an expression of opposition to a hostile work environment, inasmuch as she told Ginsberg that she was using her tweet to "protect herself" against "false statements" and "to prevent future attacks." However, Sonmez's explanation about the protective purpose of the pinned tweet did not make her refusal to remove it protected activity. While the pinned post *itself* may have "voiced her opposition to illegal discrimination" (though not on the part of her employer), *refusing to remove* the post did not clearly communicate to her employer a belief that she was being subjected to illegal discrimination based on her membership in a protected class.[99] Therefore, that refusal was not protected activity.[100]

---

[99] *See Vogel*, 944 A.2d at 465.

[100] Sonmez also argues that her refusal to remove the tweet was protected activity because it was opposition to the Post's unlawful punishment of her for the disruption caused by the online harassment. But Sonmez never said she refused to take down her post because of *the Post's* unlawful treatment (regardless of whether that treatment actually was or could have seemed unlawful). Rather, Sonmez opposed taking down the post because of unlawful treatment by third-party Twitter users and the errors in the *Reason Magazine* article. She never indicated that she was keeping up the post because (as she puts it in her brief on appeal) she "opposed [the Post's] discrimination against her based on the disruption [online] abuse caused at work." In sum, nothing about Sonmez's opposition to taking down the post would have put her employer on notice that she was complaining about the Post's illegal discrimination based on workplace disruption, rather than complaining about the third-party causes of that workplace disruption. Therefore, again, Sonmez's refusal to take down her pinned post was not protected activity.

**D.** **Protection Accorded the Post's Editorial Judgments by the First Amendment**

The Post contends that Sonmez's Human Rights Act claims also are barred by the First Amendment.[101] Specifically, the Post asserts that we must affirm the dismissal of Sonmez's complaint under Civil Rule 12(b)(6) because "[e]ven if Sonmez could state the elements of her DCHRA claims, applying D.C. law to prohibit the specific conduct at issue—namely, The Post's editorial decisions about the types of stories to assign to Sonmez in light of her public advocacy—would violate The Post's First Amendment rights." For the following reasons, we conclude (1) that even if the Post is correct, this contention would support only a partial dismissal of Sonmez's claims; and (2) it is premature at this pre-discovery stage of the proceeding to decide whether the First Amendment precludes the Human Rights Act claims to which it might apply.

As to the first point, by its terms the Post's contention applies only to Sonmez's challenges to the restrictions on her coverage of news stories involving charges of sexual misconduct. We do not see that the Post's argument applies to

---

[101] "[W]here the undisputed facts conclusively establish an affirmative defense as a matter of law[,]" a motion to dismiss on that ground may be granted. *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009).

Sonmez's other claims of illegal discriminatory mistreatment, such as the performance evaluation that allegedly had an adverse impact on her compensation.

Turning to the second point, the Post states in its brief on appeal that in asserting a First Amendment right to limit a reporter's assignments, it "is not claiming immunity from the DCHRA or other important anti-discrimination statutes." The Post states that "it is firmly committed to those statutes." In this respect, the Post's position (as we understand it) appears to coincide with longstanding precedent that the First Amendment affords news organizations "no special immunity from the application of general laws," nor any "special privilege to invade the rights and liberties of others."[102] Broadly speaking, the Supreme Court has deemed it "clear that a government regulation [impinging on the freedom of

---

[102] *Associated Press v. NLRB*, 301 U.S. 103, 132-33 (1937) (holding that news organization did not have a right under the First Amendment to discharge an editorial employee on account of his union activity and agitation for collective bargaining, where the employee's right to engage in such activity was protected by the National Labor Relations Act); *see also, e.g.*, *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991) (citing the "well-established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news"); *Wilson v. Cable News Network, Inc.*, 444 P.3d 706, 720 (Cal. 2019) ("[I]n the area of press freedoms, it has long been established that the First Amendment does not guarantee a news organization absolute control over who may write, report, or even edit on its behalf.") (citing cases).

speech under the First Amendment] is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."[103]  On its face, a government regulation protecting employees, including newspaper reporters, from invidious discrimination on the basis of race, gender, or other protected characteristics or statuses is a good candidate for satisfying this test.

A relevant and informative application of these principles to discrimination against a newspaper reporter is found in one of the cases on which the Post itself relies, *Passaic Daily News v. NLRB*.[104]  In that case, the D.C. Circuit upheld the NLRB's determination that the Passaic Daily News had unlawfully discriminated against one of its reporters when the newspaper, motivated by anti-union bias, canceled the reporter's regular weekly column.  The newspaper argued that the First Amendment precluded the NLRB from challenging its putatively "editorial" decision and from inquiring into its motives for discontinuing the column.[105]  But in

---

[103] *United States v. O'Brien*, 391 U.S. 367, 377 (1968); *see also, e.g., Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2407 (2024).

[104] 736 F.2d 1543 (D.C. Cir. 1984).

[105] *Id.* at 1555-56.

accordance with "the principles set forth in *Associated Press*," the D.C. Circuit rejected that argument and proceeded to address the terms of an appropriate order to remedy the newspaper's unlawful treatment of the reporter.[106]   The NLRB had ordered the newspaper to resume publishing the reporter's weekly column. The court held that this directive was constitutionally infirm, for as the Supreme Court held in *Miami Herald Pub. Co. v Tornillo*,[107] First Amendment principles generally do not permit the government to compel a newspaper to publish what the newspaper chooses to withhold.  But that did not mean the First Amendment exempted the Passaic Daily News from all governmental scrutiny of its editorial decisions or excused the newspaper from having to comply with anti-discrimination laws when its actions could be categorized as editorial judgments.  (Indeed, the Supreme Court itself has cautioned that its "holdings that neither a State nor the Federal Government may dictate what may or may not be printed neither expressly nor impliedly suggest that the editorial process is immune from any inquiry whatsoever."[108]) Accordingly, the D.C. Circuit remanded the case to the NLRB for it to "invoke any specific,

---

[106] *Id.* at 1556-59.

[107] 418 U.S. 241, 254, 258 (1971).

[108] *Herbert v. Lando*, 441 U.S. 153, 168 (1979).

alternate remedies" for the discriminatorily canceled reporter that would be consistent with First Amendment principles.[109]

Thus, in evaluating the Post's First Amendment challenge to Sonmez's complaint, we agree with this statement by the Supreme Court of California (in another case on which the Post has relied):

> Not every staffing decision a news organization makes—even with respect to those who write, edit, or otherwise produce content—enjoys constitutional protection. As a general rule, application of laws prohibiting racial and other forms of discrimination will leave the organization with "the full freedom and liberty" to "publish the news as it desires it published." . . . It follows that, also as a general rule, a legal challenge to a particular staffing decision will have no substantial effect on the news organization's ability to speak on public issues[.][110]

---

[109] *Passaic Daily News*, 736 F.2d at 1559. The court did not undertake to identify what "specific, alternate remedies" were open to the NLRB.

[110] *Wilson*, 444 P.3d at 721 (citing *Associated Press*, 301 U.S. at 133); *see also Hausch v. Donrey of Nev., Inc.*, 833 F. Supp. 822, 832 (D. Nev. 1993) (rejecting newspaper's First Amendment defense to editor's employment discrimination claim based on failure to promote, because application of antidiscrimination laws did not burden the newspaper's "ability to control the content and character" of its message). In the present case, the Post's editorial control over what it chooses to publish is not at issue; as Sonmez concedes, had the bans not been imposed on her, anything she wrote would still have been subject to the review and approval of her editors.

In the present case, the Post's editorial control over the substantive and stylistic content of the articles that it chooses to publish is not at issue; as Sonmez concedes, had the bans not been imposed on her, anything she wrote would still have been subject to the review and approval of her editors. Moreover, those editors raised no objections to the contents of the news stories Sonmez wrote. Rather, the Post's expressed editorial concern is with a byline identifying Sonmez as a reporter of certain news stories in view of her personal experience and public stance as a sexual assault victim. And the Post's stated position is not that its restrictions on Sonmez's reporting are constitutionally immune from all judicial scrutiny, or that it is generally free to discriminate against its reporters in violation of the Human Rights Act, but rather that the First Amendment "bars judicial intervention" when "a plaintiff bases a claim specifically on how a newspaper has applied journalistic standards to protect its content and preserve public trust in its impartiality and objectivity." Thus, the Post grounds its First Amendment argument on its assertion that it barred Sonmez from covering #MeToo stories not for discriminatory reasons,

but genuinely and reasonably in the interests of "preventing the appearance of bias resulting from her public advocacy."[111]

---

[111] Our dissenting colleague argues that because the choice of author sometimes may affect what a news story communicates or how its readers receive it, the First Amendment exempts newspapers and their editors from having to comply with anti-discrimination laws when assigning stories to reporters, and courts may not inquire into whether such assignments were motivated by invidious discriminatory animus. It is unclear why it is thought that conclusion follows from its premise, and the conclusion lacks precedential support. But according to the dissent, the Post therefore was free to discriminate against Sonmez in restricting her reporting assignments, even absent any genuine concern about her objectivity, impartiality, conflict of interest, or qualifications, and even though the Human Rights Act prohibited such discrimination.

We disagree. The defense position is contrary to longstanding precedent in this area, which we have cited above, confirming that the First Amendment does not override general laws prohibiting discrimination in employment. The dissent errs in viewing its position as a corollary of *Tornillo*'s holding that the First Amendment protects a newspaper's freedom to decide what it will or will not publish. While the First Amendment secures the right to speak and write in favor of even the most odious and unlawful discrimination, it does not secure a right to *practice* such discrimination in employment, even under the guise of exercising editorial judgment that indirectly affects the content of what is published. Binding precedent establishes that, while the exercise of editorial judgment in putting out a newspaper is indeed protected to a considerable extent under the First Amendment, it is not protected to the *same* extent as the newspaper's speech itself.

We do not understand the Post to have espoused or adopted the dissent's radical position in this appeal. The Post does not contend that it had a First Amendment right to restrict Sonmez's reporting assignments because she is a sexual assault victim or a woman (and of course the Post denies that it did so for those reasons). Rather, as we discuss above, the Post argues that its editors had a nondiscriminatory reason based on Sonmez's public stance for restricting her assignments. That is the contention we proceed to address.

Like the trial court, we recognize that the Post's asserted motivation—ensuring that the perceived impartiality of its news reporting is not compromised by a reporter's conflict of interest arising from her public statements—is a non-discriminatory reason for its assignment decisions. We do not deny that "[a] fundamental goal of . . . a news publication[] is to appear objective in the eyes of its readers."[112] And we recognize that the First Amendment affords protection to editorial decisions that are motivated by such goals.[113]

However, what actually motivated the Post editors to impose the bans on Sonmez is a factual question—a disputed one at this preliminary stage of the trial

---

[112] *Nelson v. McClatchy Newspapers*, 936 P.2d 1123, 1124-25 (Wash. 1997) (en banc); *see also Newspaper Guild of Greater Phila., Local 10 v. NLRB*, 636 F.2d 550, 560 (D.C. Cir. 1980) ("At least with respect to most news publications, credibility is central to their ultimate product and to the conduct of the enterprise.").

[113] *See Nelson*, 936 P.2d at 1125, 1129-32 (holding that while state law prohibits an employer from discriminating against an employee because the employee refuses to abstain from political activity, the First Amendment precludes application of that prohibition to a newspaper's reassignment of a reporter for violation of its ethics code, which "define[d] conflicts of interest to include all situations in which readers might be led to believe that the news reporting is biased, including situations in which reporters participate in high profile political activity"); *see also Moody*, 144 S. Ct. at 2402 (stating that "[a]n entity 'exercis[ing] editorial discretion in the selection and presentation' of content is 'engage[d] in speech activity'" protected by the First Amendment (citation omitted)); *Newspaper Guild*, 636 F.2d at 560 ("[E]ditorial control and the ability to shield that control from outside influences are within the First Amendment's zone of protection and therefore entitled to special consideration.").

court proceedings, given our conclusion that Sonmez's complaint plausibly alleges that discriminatory motivations underlay the bans. This disputed factual question cannot be resolved on the pleadings alone (which, we note, is a limitation the dissent appears to overlook). The issue will be ripe for consideration after the parties have been afforded the opportunity to take appropriate discovery—presumably, assuming the evidence of discrimination remains circumstantial at that point, on a defense motion for summary judgment litigated under the three-part burden-shifting *McDonnell Douglas* framework as discussed hereinabove. Ultimately, to avoid summary judgment for the Post, Sonmez will need to present sufficient admissible evidence, unrefuted by the defendants' evidence, from which a jury could conclude that discrimination was a substantial motivating factor in the imposition of the second ban (since Sonmez's Human Rights Act claim based on the first ban is time-barred, as previously explained). That is, assuming Sonmez makes the necessary prima facie showing of a discriminatory motivation and the defendants rely on evidence that the ban was imposed to avoid any appearance of a conflict of interest or bias in the reporting, Sonmez will need to show either that such an explanation is pretextual or, even if true, was not significant enough to overcome her evidence that discrimination was a substantial motivating factor.

## V. Conclusion

For the foregoing reasons, we reverse in part and affirm in part. Specifically, we reverse the dismissal of Counts I and II of the complaint, which allege that the Post took adverse actions against Sonmez based on her status as a victim of a sexual offense and/or her gender, and remand for further proceedings with respect to those counts. We uphold the dismissal of the other counts of the complaint for failure to state a claim upon which relief can be granted. We affirm the denial of the Anti-SLAPP Act special motion to dismiss Sonmez's complaint.

*So ordered.*

DEAHL, *Associate Judge*, dissenting: The Washington Post has a First Amendment right to decide what stories, and whose stories, it will publish. When the Post decided that it did not want to publish Felicia Sonmez's work within the ambit of the #MeToo movement, it did not fire her, demote her, change her job title or her core responsibilities. It simply took her off the #MeToo beat and temporarily reassigned her to other breaking national news stories. She continued to write front-page stories on topics like the COVID-19 pandemic, the 2020 presidential election, and President Trump's impeachment trial. *See, e.g.*, Phillip Rucker, Felicia Sonmez, and Colby Itkowitz, *Trump Impeached*, Wash. Post, Dec. 19, 2019, at A1. That reassignment was not an actionable "adverse employment action" under the

District's Human Rights Act, the DCHRA, because it was not a "significant change in [her] employment status." *Kumar v. D.C. Water & Sewer Auth.*, 25 A.3d 9, 17 (D.C. 2011). In concluding otherwise the majority walks into a novel and glaring First Amendment problem.

The Post's decisions about where to assign Sonmez were classic editorial judgments protected by the First Amendment's "freedom . . . of the press" clause, regardless of their prudence or underlying motivations. Whether such editorial decisions are "fair or unfair," objective or biased, is not for our nation's courts to decide. *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974). When it comes to the press, "it is no job for government . . . to 'un-bias' what it thinks biased," and we must instead leave all editorial "judgments to speakers and their audiences." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024); *Columbia Broad. Sys. v. Democratic Nat'l Comm.*, 412 U.S. 94, 117 (1973) (plurality op.) ("The power of a privately owned newspaper to advance its own political, social, and economic views is bounded only by two factors:" (1) "a sufficient number of readers . . . to assure financial success," and (2) "the journalistic integrity of its editors and publishers.").

The government has no place in a newspaper's editorial room. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 560-61 (1976) ("[W]e remain intensely skeptical

about those measures that would allow government to insinuate itself into the editorial rooms of this Nation's press." (quoting *Tornillo*, 418 U.S. at 259 (White, J., concurring))). I would affirm the dismissal of Sonmez's suit because it targets core First Amendment editorial judgments, and I therefore dissent.

*A. The First Amendment's protection for editorial choices extends to authorship*

One need accept only two uncontroversial points to understand why Sonmez's claims collapse under the weight of the First Amendment, and my colleagues do not dispute either of them. They resist only the conclusion that logically follows from them, as I explain in the next section.

The first point is that a press outlet like the Post has a First Amendment right to control its content. *Tornillo*, 418 U.S. at 258 ("The choice of material to go into a newspaper" involves "the exercise of editorial control and judgment" protected by the "First Amendment guarantees of a free press."). A newspaper can generally publish what it likes, including hateful and incendiary speech, subject only to a few narrow exceptions. *See generally N.Y. Times v. Sullivan*, 376 U.S. 254 (1964). It can be held liable for defaming others, or inciting imminent violence, for instance. *See id.* (defamation); *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (incitement of "imminent" criminal activity). The flipside is also true. Just as a publication is free

to publish what it likes, it cannot be compelled to publish what it would rather not. *Tornillo*, 418 U.S. at 241; *NetChoice*, 603 U.S. at 728-29.

The First Amendment right to make editorial choices free from government control trumps statutory rights like those codified in the DCHRA. Newspapers' editorial judgments are constitutionally protected whether they are virtuous or vile, inclusive or divisive, woke or bigoted; and those editorial choices about what and how a newspaper will cover stories are protected no matter what motivates them, be it objective standards or discriminatory beliefs. One can doubt the wisdom of our country's commitment to a free press—many countries do not share it—but not the fact of our historical commitment to it. As Judge Learned Hand wrote nearly a century ago, and the Supreme Court has since repeatedly echoed, to many our country's unflinching commitment to a free press "is, and always will be, folly; but we have staked upon it our all." *Sullivan*, 376 U.S. at 270 (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943)). I assume my colleagues agree with me on this first point, so I will not belabor it further.

The second point is that who authors a story can affect what is communicated by it, so that story assignments can also be editorial choices protected by the First Amendment. While this court has never previously addressed the topic, the courts that have agree on this point as well. *See, e.g.*, *McDermott v. Ampersand Publ'g*,

593 F.3d 950, 962 (9th Cir. 2010) (Newspaper's "choice of writers affects the expressive content of its newspaper" so "the First Amendment protects that choice."); *Passaic Daily News v. NLRB*, 736 F.2d 1543, 1558-59 (D.C. Cir. 1984) (even where columnist was terminated for unlawful discriminatory reasons, courts could not "mandate[e] resumption of [his] column" because they "must yield to the [newspaper's] First Amendment interest in retaining control over prospective editorial decisions"); *Wilson v. Cable News Network,* 444 P.3d 706 (Cal. 2019) ("A television producer's decision about whom to cast in a program can constitute part of the message conveyed."); *Nelson v. McClatchy Newspapers, Inc.*, 936 P.2d 1123, 1131 (Wash. 1997) (A newspaper "cannot be required to publish a particular reporter's work."); *Hunter v. CBS Broadcasting*, 165 Cal. Rptr. 3d 123, 126, 136 (Ct. App. 2013) (holding that broadcasting company enjoys First Amendment protection for choice of on-air weather anchor against allegations of age and gender discrimination).

This second point should be uncontroversial too: the messenger can of course affect the message. If a news program is covering Black Lives Matter, its coverage may be received quite differently if its correspondents are black or white—even if the content is otherwise identical.[1] The force and very newsworthiness of a political

---

[1] For instance, one ABC news program understandably came under heavy fire when it had an all-white panel discussing the Black Lives Matter protests. *See*

endorsement will change drastically if its authors are from across the political aisle rather than from within the rank-and-file.[2] When covering the war in Gaza, having an Israeli Jewish reporter lead your coverage versus a Palestinian Muslim (or an American Christian) will affect the force of your reporting, and the audience it is likely to reach. And if the evening news's health reporter is morbidly obese, an outlet could reasonably worry that some viewers will discount their advice. Whatever you think of such editorial judgments, they are protected editorial judgments all the same, and they are made in newsrooms across our country every single day. Editors must assess and make judgments about their messengers' impact on the paper's message. They are free to do that without governmental intrusion.

Lawyers should be especially attuned to this second point since it pervades our own profession. Parties frequently pick their advocates with considerations like race, gender, and political baggage in mind. Thurgood Marshall, who would go on to be this nation's first black Supreme Court Justice, led the attack on school segregation when he argued the seminal case of *Brown v. Board of Education*, 347

---

Ahmed Yussuf, *Lack of Diversity in Black Lives Matter Coverage*, SBS News: The Feed (June 9, 2020) (https://www.sbs.com.au/news/the-feed/article/lack-of-diversity-in-black-lives-matter-coverage-a-monolithic-cultural-background-and-colour/igdkbtlxh; https://perma.cc/UV7G-78RV).

[2] Political affiliation—like race, religion, personal appearance, and gender—is a protected trait under the DCHRA. D.C. Code § 2-1401.01.

U.S. 483 (1954), before the Supreme Court of the United States. More recently a transgender man, Chase Strangio, was selected by his client to argue before the Supreme Court in *United States v. Skrmetti*, 23-477 (argued Dec. 4, 2020), challenging Tennessee's restrictions on medical treatments used for gender transitions. And it was not mere happenstance that Harvey Weinstein and Donald Trump both chose female advocates—Donna Rotunno and Alina Habba, respectively—to lead their defenses against sexual assault allegations. Each client's choice of advocates was no doubt influenced by countless factors in those cases, and in each case they surely selected the advocate they believed to be best suited to represent them. But race, gender, and political affiliations can obviously play a role in the calculus of who is best to deliver a particular message, or defend a particular cause, and the First Amendment protects those considerations.

Courts are no different when selecting who is best to author an opinion. When the Supreme Court upheld the core of the Affordable Care Act in *NFIB v. Sebelius*, 567 U.S. 519 (2012), and later recognized a constitutional right to gay marriage in *Obergefell v. Hodges*, 576 U.S. 644 (2015), the lone Republican-appointed justices in the respective majorities—Chief Justice Roberts and Justice Kennedy—took the pen. When the Supreme Court upheld the University of Michigan Law School's "affirmative action" policies in *Grutter v. Bollinger*, 539 U.S. 306 (2003), and struck down Virginia Military Institute's male-only admission policy in *United States v.*

*Virginia*, 518 U.S. 515 (1996), it was no coincidence that those opinions were assigned to the first and second women to sit on the Supreme Court—Justices O'Connor and Ginsburg, respectively. All of those authorship decisions were part of the Court's message, and that was not lost on the public. And your reaction to this dissenting opinion could well be affected by the fact that it is written by a Trump appointee—a "Trump judge," to borrow a phrase—rather than an "Obama judge" or a "Biden judge." That is why the media so regularly identifies the President who appointed a particular judge when reporting on their opinions, particularly when it wants to detract from an opinion's force. That might be a lazy heuristic that I would rather be rid of, but I am not dense enough to believe it will not affect some readers' views of this opinion's merits.

Thus far I have stated only what I take to be obvious: messengers, personal characteristics and all, can affect the message. I cannot tell if my colleagues agree with me about that because they sidestep the point by positing that "the Post's editorial control over . . . [what] it chooses to publish is"—somehow—"not at issue" in this case. *Ante* at 94. I will now explain why it is not only at issue in, but resolves, this case. I will then try to diagnose where precisely my colleagues misstep in concluding otherwise.

## B. Sonmez's suit targets editorial judgments on authorship

Let me frame how I see the First Amendment question in this case because, with the above two points in mind, I see it quite differently from my colleagues. The relevant question is not whether the Post was *right* to reassign Sonmez off of #MeToo coverage, or had good reasons for doing so. And it is also not, as the majority seems to hold, whether it had a purely "non-discriminatory reason for its assignment decisions," *ante* at 96 (emphases added). I tend to agree with my colleagues that Sonmez has plausibly alleged otherwise, as a person can virtually always plausibly attribute nefarious motives to another.[3] I simply see it as beside the point because statutory proscriptions must yield to constitutional rights, and not

---

[3] The majority asserts that I have "overlook[ed]" that Sonmez disputes what the Post's motivations were, *ante* at 97, but I have done no such thing. I explain at length why the motivations underlying editorial decisions do not matter to the proper First Amendment analysis. The majority seems to think that motivations are all that matter, i.e., that editorial decisions get no protection if they are animated by statutorily proscribed motives. That view provides a ready end-run to the First Amendment's protections—legislatures can control an outlet's content, if somewhat indirectly, by proscribing whatever motivations they find undesirable. I do agree with my colleagues, as the Post concedes, that the First Amendment is no bar to Sonmez's "other claims of illegal discriminatory treatment" beyond its assignment decisions, such as the poor performance review that she alleges negatively affected her pay. I doubt she has plausibly alleged those claims for the distinct reason embraced by the trial court, that her complaint itself closely tethers those actions to her public statements as opposed to her victim status. In any event, the bulk of her claims and purported damages stem from her reassignment off of the #MeToo beat, so I focus on that core of her complaint.

the other way around as the majority suggests. The press does not need to satisfy the government that its editorial judgments are valid or non-discriminatory, so long as they are indeed editorial judgments.

The relevant question is thus whether the Post exercised an editorial judgment *at all* when it reassigned Sonmez off of the #MeToo beat, i.e., did it make a judgment affecting the content of what went into its paper. Just as surely as a newspaper is free to publish hate-filled incendiary content, subject only to the check of its readership, its editorial judgments on authorship are protected by the First Amendment even when they are infected by discrimination. *Passaic Daily,* 736 F.2d at 1558 ("[N]ewspapers have absolute discretion to determine the contents of their newspapers.").

So let's talk about why the Post's reassignment of Sonmez off of the #MeToo beat was an editorial judgment, even when taking all of her allegations as true. Recall the relevant facts alleged in Sonmez's complaint.

Sonmez was at the center of national news stories in late August of 2019, triggered by a *Reason Magazine* article that not too subtly suggested she had equated "a messy, drunken hookup" with a rape, and thereby helped to unfairly torpedo Jonathan Kaiman's career. Emily Yoffe, *I'm Radioactive*, *Reason Magazine* (Aug. 23, 2019). I hasten to add that Kaiman had other accusers—most notably, Laura

Tucker published a piece on Medium.com regarding her own allegations against Kaiman before Sonmez came forward—though Yoffe's article was similarly dismissive of them.  There was backlash against Yoffe's article and it became the subject of national news debate about how the media covers #MeToo allegations in outlets ranging from NPR to Jezebel.  *See, e.g.*, Anna Merlan, *Emily Yoffe Back on Her Bullshit*, Jezebel (Aug. 30, 2019) (noting a "ferocious reaction" to Yoffe's piece that "is playing out in a highly public way").  One participant in that debate was Atlantic contributor Caitlin Flanagan, who according to Sonmez's complaint "grossly mischaracterized Ms. Sonmez's allegations" against Kaiman during an appearance on NPR's All Things Considered.  Sonmez then engaged Flanagan in a public Twitter exchange, where Flanagan eventually tapped out with: "Felicia, the person you're really angry at," Kaiman, "lost his job and his book contract.  He's had suicidal episodes. . . . What more do you want from him?  You won."

The very next day the Post took Sonmez off of #MeToo coverage, a topic on which she had authored many stories over the preceding year despite her editors' knowledge of her status as the victim of a sexual offense.  The majority calls this the "second ban," though it is better described as a reassignment to other national news stories.[4]  About five months into that reassignment, Sonmez retweeted a story about

---

[4] Sonmez does not dispute that her claims targeting the "first ban" are barred by the statute of limitations, so I will relegate this refresher about the underlying

sexual assault allegations against Kobe Bryant in the immediate wake of his death. She plausibly alleges that she violated no policy by doing so, and it seems like a perfectly fair thing for someone to post. But it could also reasonably reinforce perceptions that Sonmez would be seen by readers as having a dog in the fight when it came to #MeToo issues. Her reassignment would last another fourteen months, after which Sonmez was allowed to resume reporting on #MeToo stories.

That all tees up the question of whether the mere fact of Sonmez's authorship could affect how the Post's #MeToo stories were received by its readership during her second reassignment. The answer is undoubtedly yes. Contrary to the majority's assertion, my view is not that all assignment decisions are editorial judgments so

facts to a footnote: On September 16, 2018, the Post broke the news of Christine Blasey Ford's sexual assault accusation against then-Judge Brett Kavanaugh, prompting a renewal of his confirmation hearings for a seat on the Supreme Court. Sonmez initially covered that story, including by authoring a front-page story about it for the Post. Then, two days later, she issued a public statement—with the Post's blessing, in her telling—to a wide variety of news outlets regarding the L.A. Times' recently-concluded investigation into her allegations against Kaiman. She explained in her statement that "[t]he voices of women are a crucial part of the equation when it comes to combatting sexual misconduct," and criticized the L.A. Times's "handling of this situation" because it "ha[d] not been transparent about the results of its investigation" into Kaiman. The Post promptly took Sonmez off of the Blasey Ford / Kavanaugh story and removed her from #MeToo coverage entirely for about a month-and-a-half, until after the mid-term elections. I agree with my colleagues that this first reassignment is relevant as background to Sonmez's claims targeting the second reassignment, though I think these facts only make it clearer that the Post has consistently exercised editorial judgment when reassigning Sonmez.

that "the First Amendment exempts newspapers and their editors from having to comply with anti-discrimination laws when assigning stories to reporters." *Ante* at 95 n.111. It is not hard to imagine assignments of relatively faceless reporters on vanilla beats that would have no conceivable impact on an outlet's message. It is that *this* assignment decision was an editorial judgment, given (1) Sonmez's prominent public profile as a victim of sexual assault, (2) her outspoken criticisms of how others had covered and investigated #MeToo issues, and (3) how narrowly tailored the Post's reassignment decision (to everything but the #MeToo beat) responded to that evident concern. This is, in fact, a powerful case study of when a newspaper's messenger would likely affect its message. The force of a newspaper's #MeToo reporting can clearly be affected by delivering its messages through those, like Sonmez, whose own sexual assault allegations are at the center of national news. The majority offers no reason to think otherwise.

Sonmez counters that her reassignment "carried no comprehensible 'message' to the public at all," because the Post did not publicize her reassignment. She is probably right that few if any readers would piece together on their own that she had been taken off #MeToo coverage, but that misses the point. The Post was not seeking to convey a message to its readers by reassigning Sonmez, but was seeking to *avoid* conveying the message that would have naturally followed had the Post published her stories in the midst of her own personal #MeToo firestorm. Publishing

those stories during that time would have conveyed to some readers that the Post was unconcerned with her arguable partiality on the topic, and perhaps that the paper's journalistic standards were lacking. It also would have given some readers a ready excuse to discount her reporting on the topic, even if at the same time some readers might have seen her as an especially important voice on the matter.

Those who would cheer today's ruling as a victory for anti-discrimination might just lack the imagination to see how readily it can be turned against them. To illustrate, imagine a white supremacist party wrestles control of government and takes to passing "anti-discrimination" laws requiring "equal airtime" and "fair coverage" be given to their representatives and policy perspectives. That is not so far-fetched—like the DCHRA, the law would prohibit discriminating against the party's representatives on the basis of political affiliation. *Cf. NetChoice*, 603 U.S. at 721 (describing Texas law prohibiting social media companies from "deny[ing] equal access or visibility" based on political viewpoint).[5] Of course many outlets

---

[5] More than half-a-century ago, back when most Americans had access to only the "big 3" networks on television (ABC, NBC, and CBS), a unanimous Supreme Court upheld the constitutionality of the FCC's now-abandoned "fairness doctrine." *See Red Lion Broad. Co. v. FCC*, 395 U.S. 367 (1969). That doctrine required broadcasters to give "equal time" and "fair coverage" to both sides of controversial issues of public importance, on the then-sensible theory that "frequencies reserved for public broadcasting were limited" so that governmental regulation of then-scarce public airwaves was critical to ensuring an informed public. *Id.* at 369-70, 388, 390. Two years later, the Supreme Court refused to extend that same reasoning to newspapers in *Tornillo*, given that there were no similar limitations precluding the

would not want to give airtime to that party's messengers or messages, irrespective of their particulars; they would not want to humanize them or normalize their ideas. The implications of today's holding are that those outlets can be legislatively precluded from simply boxing that party out. It is no answer to say that the outlets can police the content of their messages on the backend. Even if some of their discrete messages are innocuous, speaking only of America's greatness and the prosperous future to come, the very idea that outlets would be required to platform those who they find noxious is an affront to the First Amendment. We cannot toss aside the First Amendment's shield against legislation we deem to be virtuous and expect it to boomerang back into our hands—Captain America style—when the next piece of legislation is vile.

Because the Post's editorial judgments are protected by the First Amendment regardless of whether they were objective or discriminatory, it does not matter (contrary to Sonmez's arguments) whether the Post was consistent or objective in

---

propagation of countless newspapers. 418 U.S. 241; *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 637 (1994) (explaining that "[t]he justification for our distinct approach to broadcast regulation rests upon the unique physical limitations of the broadcast medium"). There is little chance the fairness doctrine, had the FCC not abandoned it long ago, would survive judicial scrutiny today. Massive changes in both the media landscape (like the advent of the internet) and in First Amendment jurisprudence (with cases like *NetChoice*) have left no room for *Red Lion*'s rationale. In any event, print media like the Post and cable channels can plainly not be constitutionally regulated by a fairness doctrine equivalent.

how it made its story assignments. The fact that Michelle Ye Hee Lee continued reporting on anti-Asian violence despite her public criticisms of how the media covered it is irrelevant. While I do not find Lee's situation comparable to Sonmez's—her own personal experiences were not the subject of any national debate—even if I did, the Post can make imperfect and even discriminatory editorial judgments. Heck, the Post could throw objectivity out the window and dedicate itself to a singular platform of combatting anti-Asian crimes, or to casting doubt on all #MeToo allegations. Our nation's courts are not in the business of policing the media's editorial judgments for objectivity.

## C. The majority's First Amendment missteps

The majority makes three critical missteps in reaching its contrary conclusion.

The first is that it misattributes a concession to the Post, claiming that it "does not contend that it had a First Amendment right to restrict Sonmez's reporting assignments because she is a sexual assault victim or a woman." *Ante* at 95 n.111. It is wrong about that. While the Post forcefully argues that its reassignments were not discriminatory—but were instead the byproducts of concern over Sonmez's (and therefore the paper's) perceived objectivity—it further argues that this doesn't matter to the First Amendment analysis. To quote from its brief: "Even if Sonmez could state the elements of her DCHRA claims, applying D.C. law to prohibit the

specific conduct at issue—namely, The Post's editorial decisions about the types of stories to assign to Sonmez in light of her public advocacy—would violate The Post's First Amendment rights." It reformulates the point: "[B]ecause a story's authorship may affect its message and efficacy, the First Amendment also prohibits interference with decisions regarding *which writers* should report which stories." The Post is right either way you frame the point, and it certainly has not conceded otherwise.

The second misstep comes via the majority's too-generalized invocation of the principle that media outlets have no "immunity from the DCHRA or other important anti-discrimination statutes."[6] *Ante* at 91 (quoting the Post's brief). That is 100% correct, *Associated Press v. NLRB*, 301 U.S. 103, 132-33 (1937), but beside the point. The Post makes countless employment decisions that are disconnected

---

[6] It is through its invocation of this general principle alone that the majority claims adherence to "longstanding precedent" despite its inability to cite to a single case—in this or any other jurisdiction—permitting a suit like this to proceed, where the challenged employment action concerned only which stories a reporter was assigned to. *Ante* at 95 n.111. So while the majority describes my position as "radical," *id.*, it is the majority that hoes new ground without any precedential support. Its opinion today will allow any reporter to drag a news outlet into court upon a bare allegation that its assignment decisions were discriminatory, no matter how tightly that assignment decision was tethered to the outlet's messaging. The chilling effect that will have on media outlets in making assignment decisions is obvious, so I consider today's decision to be a serious blow to the First Amendment's guarantee of a free press.

from editorial judgments, and the First Amendment is of no help to it in those instances. It is only in the sphere of editorial judgments—i.e., the contents of its newspaper—that the First Amendment sweeps in to preclude the DCHRA's enforcement. *See Tornillo*, 418 U.S. at 258 n.24 ("Liberty of the press is in peril as soon as the government tries to compel what is to go into a newspaper." (quoting 2 Zechariah Chafee, *Gov't & Mass Comms.* 633 (1947))); *NetChoice*, 603 U.S. at 719 (the government is not free to "un-bias" a media outlet's content).

To illustrate the point, if Sonmez were part of the Post's IT staff, or a copy editor, the Post could not invoke its editorial judgment to bar her suit—her position would not plausibly communicate anything to its readership. Even as a writer who interfaces directly with the public through her stories, the Post could not dock Sonmez's pay or restrict her paid leave in discriminatory manners—the First Amendment affords no shelter to such non-editorial judgments. And Sonmez would probably have a viable DCHRA claim if the Post had fired her despite her apparent qualifications to ably cover topics beyond the #MeToo movement. *See Passaic Daily*, 736 F.2d at 1549 (upholding order directing that columnist fired for discriminatory reasons be reinstated, but vacating directive that the paper "resume publication of [his] weekly column"); *but see Nelson*, 936 P.2d at 1131 (Because "a newspaper cannot be required to publish a particular reporter's work," it cannot "be

constitutionally required to employ the individual as a reporter.").[7]  So the tough work in this case begins, and ends, in determining whether the Post's reassignment decision was an editorial judgment, and the majority does not undertake that task.

The majority skips that all-important inquiry by taking its third misstep, positing that "the Post's editorial control over . . . [what] it chooses to publish is not at issue" in this case.  *Ante* at 94.  That is self-evidently wrong.  The Post made a determination not to publish Sonmez's #MeToo-related work for the duration of her reassignments—of course it was exercising editorial discretion not to publish that work.  So I take the majority to recognize that the Post could have achieved this same end, free from judicial scrutiny, had it only kept Sonmez on the #MeToo beat and then decided to shelve each of her pieces on a case-by-case basis, for any

---

[7] *Nelson* overstates the point, in my view.  For a beat reporter whose mere authorship could only plausibly affect the newspaper's message on discrete topics, like Sonmez, the potential for reassignment would likely strip any decision to terminate her of its editorial character.  But I would agree with *Nelson* if, instead of a beat reporter, the employee was an editor who had the final say of what went into the paper on a regular basis.  In that case their termination or demotion would seem to be an editorial judgment because the employee directly controls what does, and does not, go into the paper's pages.  *See Wilson*, 444 P.3d at 721 ("[T]he decision to hire or fire an employee who is vested with ultimate authority to determine a news organization's message might well have a substantial effect on the organization's ability to speak as it chooses on matters of public concern.").  It is only because Sonmez targets her discrete reassignment, away from topics on which her authorship could affect the paper's messaging, that I believe her suit is barred by the First Amendment.

reason.[8] There is no conceivable justification for putting it through that pageantry. The Post had already determined it did not want Sonmez as the messenger for its #MeToo coverage during her reassignments. The majority also blinks the reality that for a daily newspaper like the Post, its assignment of breaking stories—while ostensibly revocable until the stories hit print—are inextricable from its decisions about what it will print in the coming days. And because breaking news reporters often work in teams, assigning Sonmez to a particular team would risk shelving her co-authors' work as well, given that the Post did not want to publish Sonmez's work.

To again draw an analogy to our own profession, if a judge determines that their participation in a case would raise an "appearance of partiality," they should recuse from the case without delay. *In re D.M.*, 993 A.2d 535, 537 (D.C. 2010) (observing that our "ethical canons . . . require recusal when there exists an appearance of partiality on the judge's part"). It would be a wild violation of our

---

[8] I do not understand Sonmez to make the same concession. I instead take her position to be that any determination about whether to run her stories—even on a case-by-case basis—had to be based on objective and non-discriminatory factors. The majority does not defend that view, for good reason. As we have covered, the First Amendment is there to keep the government from imposing its own views about what speech is objective and valuable on the press. The press can make editorial judgments about the contents of their publications that are steeped in discriminatory and noxious motives. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989)).

ethical duties to sit on such a case to wait-and-see how we'd decide it, and to only then make our recusal decision based on the content of the opinion we proposed to issue. That would make the ethical violation so much worse—how could one decide if they had sufficiently un-biased themselves? Would they be willing to rule only in favor of the party whom they appear to be biased against, which would of course give the judge an actual bias in the case (they are willing to rule favorably only for one side). Similarly, where the Post had determined that it did not want to run Sonmez's stories on #MeToo during her reassignments, how could the contents of her particular writings disabuse them of that? Were they to publish her articles only if she expressed skepticism of sexual assault allegations, and sympathy with the accused? That would double down on the publication's partiality concerns—it would itself be actively engaged in partial decisionmaking—rather than ameliorating them.

At bottom, the majority has not seriously engaged with the determinative First Amendment question in this case. The relevant question is whether the Post's reassignment of Sonmez was an editorial judgment, that is, a judgment affecting the content of what went into its paper. And even when taking the facts in the light most favorable to Sonmez at this stage of the proceedings, it undoubtedly was.

I would affirm the trial court's dismissal of Sonmez's suit because her attacks

on her reassignment off of the #MeToo beat run afoul of the First Amendment.[9]

---

[9] Like my colleagues and the parties, the trial court focused its analysis on the Anti-SLAPP Act and whether the Post's assignment decisions constituted an "act in furtherance of the right of advocacy on issues of public interest," as that term is defined in D.C. Code § 16-5501(1). For the same reasons that I view Sonmez's authorship of #MeToo stories as part and parcel of the message that would be conveyed by publishing those stories, I am dubious about the majority's conclusion that the Anti-SLAPP Act does not apply here. I do not examine that question further because the First Amendment applies of its own force and resolves the case.